On August 2, 2002, William Henry Lee, a convicted sex offender, was indicted for violating the Community Notification Act ("CNA"), specifically for establishing a residence within 2,000 feet of a child care facility, a violation of § 15-20-26(a), Ala. Code 1975. On January 30, 2003, Lee filed a motion to dismiss the indictment, which the trial court denied in a written order on April 17, 2003. On June 6, 2003, Lee pleaded guilty to violating the CNA residency requirements. Before the trial court accepted his plea, Lee specifically reserved for appellate review "the issue . . . of the constitutionality of the Community Notification Act." (R. 9.) The trial court sentenced Lee to serve one year and one day in jail. This appeal followed.
On appeal, Lee argues that the CNA's residency requirement under § 15-20-26(a) is unconstitutional on three grounds: 1) it constitutes retroactive punishment proscribed by the ex post facto clause of the United States Constitution; 2) it violates his procedural due process rights; and 3) it violates his substantive due process rights. Lee advanced all three arguments in his motion to dismiss the indictment. However, in its order denying the motion, the trial court addressed only his argument concerning whether the CNA's residency requirement violated the ex post facto clause. Thus the trial court did not first address Lee's arguments regarding procedural due process and substantive due process, failing to render an adverse ruling on those claims. Absent a timely objection and an adverse ruling, nothing is preserved for appellate review. See Pace v. State,714 So.2d 332, 334 (Ala. 1997) (citing Biddie v. State, 516 So.2d 846
(Ala. 1987)).[1]
The pertinent part of the statute in question reads as follows: "Unless otherwise exempted by law, no adult criminal sex offender shall establish a residence or accept employment within 2,000 feet of the property on which any school or child care *Page 1040 
facility is located." § 15-20-26(a), Ala. Code 1975. Further, the legislature made the following findings in enacting the CNA:
 "The Legislature finds that the danger of recidivism posed by criminal sex offenders and that the protection of the public from these offenders is a paramount concern or interest to government. The Legislature further finds that law enforcement agencies' efforts to protect their communities, conduct investigations, and quickly apprehend criminal sex offenders are impaired by the lack of information about criminal sex offenders who live within their jurisdiction and that the lack of information shared with the public may result in the failure of the criminal justice system to identify, investigate, apprehend, and prosecute criminal sex offenders.
 "The system of registering criminal sex offenders is a proper exercise of the state's police power regulating present and ongoing conduct. Comprehensive registration and periodic address verification will provide law enforcement with additional information critical to preventing sexual victimization and to resolving incidents involving sexual abuse and exploitation promptly. It will allow them to alert the public when necessary for the continued protection of the community.
 "Persons found to have committed a sex offense have a reduced expectation of privacy because of the public's interest in safety and in the effective operation of government. In balancing offender's due process and other rights, and the interests of public security, the Legislature finds that releasing information about criminal sex offenders to law enforcement agencies and, providing access to or releasing such information about criminal sex offenders to the general public, will further the primary government interest of protecting vulnerable populations and in some instances the public, from potential harm. The legislature further finds that residency and employment restrictions for criminal sex offenders provide additional protections to vulnerable segments of the public such as schools and child care facilities.
 "Juvenile sex offenders, like their adult counterparts, pose a danger to the public. Research has shown, however, that there are significant differences between adult and juvenile criminal sexual offenders. Juveniles are much more likely to respond favorably to sexual offender treatment. Juvenile offenders have a shorter history of committing sexual offenses. They are less likely to have deviant sexual arousal patterns and are not as practiced in avoiding responsibility for their abusive behavior. Juveniles are dependent upon adults for food and shelter, as well as the emotional and practical support vital to treatment efforts. Earlier intervention increases the opportunity for success in teaching juveniles how to reduce their risk of sexually re-offending. The Legislature finds juvenile criminal sex offenders should be subject to the Community Notification Act, but that certain precautions should be taken to target the juveniles that pose the more serious threats to the public.
 "Therefore, the state policy is to assist local law enforcement agencies' efforts to protect their communities by requiring criminal sex offenders to register, record their address of residence, to be photographed, fingerprinted, to authorize the release of necessary and relevant information about criminal sex offenders to the public, to mandate residency and employment restrictions upon criminal sex offenders, and to provide certain discretion to judges for application of *Page 1041 
these requirements as provided in this article."
§ 15-20-20.1, Ala. Code 1975.
In his motion to dismiss the indictment, although he claimed to have been "punish[ed]" under the residency requirement of the CNA, Lee did not allege any facts to underlie his claim that the residency requirement of the CNA constituted a punitive measure, rather than a civil measure. He alleged neither facts to establish that the statute, as applied to him, was punitive, nor did he allege facts to establish that the statute was punitive on its face.[2]
Turning to Lee's argument that the residency requirement of the CNA is retroactive and punitive in violation of the ex post facto clause, we find guidance in our determination of the merits of his argument in a recent United States Supreme Court case, Smithv. Doe, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), in which the Court held that the Alaska Sex Offender Registration Act was not unconstitutional and not violative of the ex post facto clause. Although certainly Alabama's CNA differs from Alaska's legislation, we nonetheless apply the following governing principles of law gleaned from Smith to this case:
 "This is the first time we have considered a claim that a sex offender registration and notification law constitutes retroactive punishment forbidden by the Ex Post Facto Clause. The framework for our inquiry, however, is well established. We must `ascertain whether the legislature meant the statute to establish "civil" proceedings.' Kansas v. Hendricks, 521 U.S. 346, 361 [, 117 S.Ct. 2072, 138 L.Ed.2d 501] (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is `"so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil."' Ibid. (quoting United States v. Ward, 448 U.S. 242, 248-249[, 100 S.Ct. 2636, 65 L.Ed.2d 742] (1980)). Because we `ordinarily defer to the legislature's stated intent,' Hendricks, supra, at 361[, 117 S.Ct. 2072], `"only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty,' Hudson v. United States, 522 U.S. 93, 100[, 118 S.Ct. 488, 139 L.Ed.2d 450] (1997) (quoting Ward, supra, at 249[, 100 S.Ct. 2636]); see also Hendricks, supra, at 361[, 117 S.Ct. 2072]; United States v. Ursery, 518 U.S. 267, 290[, 116 S.Ct. 2135, 135 L.Ed.2d 549] (1996); United States v. One Assortment of 89 Firearms, 465 U.S. 354, 365[, 104 S.Ct. 1099, 79 L.Ed.2d 361] (1984).
 "A "Whether a statutory scheme is civil or criminal `is first of all a question of statutory construction.' Hendricks, supra, at 361[, 117 S.Ct. 2072] (internal quotation marks omitted); see also Hudson, supra, at 99[, 118 S.Ct. 488]. We consider the statute's text and its structure to determine the legislative objective. Flemming v. Nestor, 363 U.S. 603, 617[, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)]. A conclusion that the legislature intended to punish would satisfy an ex post facto challenge without further inquiry into its effects, so considerable deference must be accorded to the intent as the legislature has stated it.
 "The courts `must first ask whether the legislature, in establishing the penalizing mechanism, indicated either expressly *Page 1042 
or impliedly a preference for one label or the other.' Hudson, supra, at 99[, 118 S.Ct. 488] (internal quotation marks omitted)."
538 U.S. at 92-93, 123 S.Ct. 1140.
Here, in creating the residency requirement of the CNA, the Alabama Legislature did not expressly indicate a preference to label the statute punitive. Rather, the Legislature found that the public was in danger from sex offenders because of the high recidivism rate among such offenders. The Legislature also determined that, because of such danger, certain vulnerable segments of the population should be afforded extra protection from sex offenders' thus the requirement that sex offenders live some distance from schools and child care facilities. The Legislature concluded that requiring sex offenders to live some distance from schools and child care facilities worked to assist local law enforcement agencies in their efforts to protect their communities. Therefore, from the face of the statute, we can determine that the Legislature intended to create a civil scheme designed to protect the citizens of Alabama and their children from harm, as "`[n]othing on the face of the statute suggests that the legislature sought to create anything other than a civil . . . scheme designed to protect the public from harm.' [Kansasv. Hendricks, 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501
(1997).]" Smith, 538 U.S. at 93, 123 S.Ct. 1140.
We also note, as the Court did in Smith, that although the statute in question is found in the Criminal Code, such placement is not dispositive of the question of whether the legislative intent in enacting the residency requirement of the CNA was punitive. Rather, "[t]he location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one." 538 U.S. at 94, 123 S.Ct. 1140. The criminal section of the Alabama Code contains numerous provision that do not involve criminal punishment, including provisions involving jurisdiction and venue, searches and seizures, victims' rights, preliminary hearings, etc. Therefore, we do not hold the codification of the Act in the Criminal Code as "sufficient to support a conclusion that the legislative intent was punitive."538 U.S. at 95, 123 S.Ct. 1140.
Because we conclude that the intent of the Alabama Legislature in promulgating the residency requirement of the CNA was to create a civil, nonpunitive legislative scheme, we must now determine whether the statute is so punitive in effect as to negate the legislature's intent.
 "In analyzing the effects of the Act we refer to the seven factors noted in Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-169[, 83 S.Ct. 554, 9 L.Ed.2d 644] (1963), as a useful framework. These factors, which migrated into our ex post facto case law from double jeopardy jurisprudence, have their earlier origins in cases under the Sixth and Eighth Amendments, as well as the Bill of Attainder and the Ex Post Facto Clauses. See id., at 168-169, and nn. 22-28 [, 83 S.Ct. 554]. Because the Mendoza-Martinez factors are designed to apply in various constitutional contexts, we have said they are `neither exhaustive nor dispositive,' United States v. Ward, 448 U.S. [242], at 249 [, 100 S.Ct. 2636, 65 L.Ed.2d 742]; [United States v. One Assortment of] 89 Firearms, [465 U.S. 354,] at 365, n. 7[, 104 S.Ct. 1099, 79 L.Ed.2d 361], but are `useful guideposts,' Hudson [v. United States], 522 U.S. [93], at 99 [, 118 S.Ct. 488, 139 L.Ed.2d 450] [(1997)]. The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; *Page 1043 
has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose."
Smith, 538 U.S. at 97, 123 S.Ct. 1140. "It is important to note, however, that `these factors must be considered in relation to the statute on its face,' [Kennedy v. Mendoza-Martinez,372 U.S. 144, 169, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)], and `only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty, [United States v. Ward, 448 U.S. 242, 249,100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)]." Hudson v.United States, 522 U.S. 93, 100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997).
As for whether the residency requirement of the CNA has historically been regarded in Alabama's history as a punishment, Lee argues on appeal that, in effect, he has been banished and has been rendered homeless. We note that Lee never presented those contentions of banishment and homelessness to the trial court. Thus it follows that there were no factual bases for these claims presented to the trial court. That is, Lee presented no evidence to the trial court indicating that he or any other sex offender was homeless, or that he or any other sex offender had been banished from his home or his community. See, e.g., Statev. Seering (No. CRIM. AGIN006718, April 30, 2003) (Iowa Dist.Ct. 2003) (unpublished opinion). The only fact established at trial was that Lee was in fact living at an address within 2,000 feet of a child care facility. Without any allegation or proof as to how this statute, on its face, actually rendered him or any other sex offenders banished or homeless, we cannot say that the residency requirements of the CNA operate to establish a regulatory scheme that has been considered punitive.
Similarly, Lee has not pleaded or proved whether the residency requirement of the CNA imposes an affirmative disability or restraint on him or any other sex offender. Lee did not plead any facts in his motion to dismiss the indictment to establish a disability or restraint created by the residency requirement of the CNA on his part or on the part of any other sex offenders.See, e.g., State v. Seering, supra. Without any factual basis, we cannot determine whether Lee or any other sex offender was affirmatively disabled or restrained by the residency requirement of the CNA, particularly because "[t]he record in this case contains no evidence that the Act has led to substantial . . . housing disadvantages for former sex offenders that would not have otherwise occurred through the use of routine background checks by . . . landlords." Smith, 538 U.S. at 100,123 S.Ct. 1140.
Although not addressed by Lee, we also note the residency requirement of the CNA does not promote the traditional aims of punishment. In terms of deterrence, we can determine by the bare record before us that, to the extent that the residency requirements of the CNA could be said to possibly deter future crimes, as the Court noted in Smith,"[a]ny number of governmental programs might deter crime without imposing punishment. `To hold that the mere presence of a deterrent purpose renders such sanctions "criminal". . . would severely undermine the Government's ability to engage in effective regulation.'" 538 U.S. at 102, 123 S.Ct. 1140 (quoting Hudson,522 U.S. at 105, 118 S.Ct. 488).
Lee concedes that the residency requirement of the CNA has a rational, nonpunitive purpose, that is, public safety, but he argues that the statute is excessive with respect to its purpose. Again, Lee did not allege any facts at trial to underlie his contention that the residency requirement of the CNA was overbroad in its endeavor to achieve its rational, nonpunitive *Page 1044 
purpose. Again, without any factual basis, as for any assertion of excessiveness, neither the trial court, nor in turn this Court, can make any determination as to whether the residency requirement of the CNA is excessive with respect to its purpose of preserving public safety in terms of Lee or any other sex offender. "The excessiveness inquiry of our ex post facto
jurisprudence is not an exercise in determining whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." Smith, 538 U.S. at 105, 123 S.Ct. 1140. Nothing in the record before us indicates that the regulatory scheme of the residency requirement of the CNA is anything other than reasonable in light of the nonpunitive objective of keeping children safe from convicted sex offenders.
After examining the residency requirements of the CNA in light of the governing principles of law in Smith, we hold that Lee has not shown by the clearest proof that the effects of the residency requirement of the CNA negate the Legislature's intention to protect the public, in particular children, from convicted sex offenders. Therefore, the record before us indicates only that the residency requirement of the CNA is nonpunitive, both on its face and in terms of its effects. Therefore, the retroactive application of the residency requirement of the CNA does not violate the ex post facto clause.
For the reasons stated above, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and BASCHAB, SHAW, and WISE, JJ., concur.
[1] We also note that, on appeal, Lee appears to take issue with other portions of the CNA. Besides the fact that he did not take issue with those other sections of the CNA in the trial court, Lee was convicted under only one section of the CNA and therefore has standing to contest the constitutionality of only that section.
[2] Lee alleges a few facts on appeal. However, we consider only that evidence and those arguments properly submitted and considered in the court below.