168 Cal.App.4th 512 (2008)
THE PEOPLE, Plaintiff and Respondent,
v.
STEVEN LLOYD MOSLEY, Defendant and Appellant.
No. G038379.
Court of Appeals of California, Fourth District, Division Three.
November 19, 2008.
*514 Allison H. Ting, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Angela M. Borzachillo, Deputy Attorney General, for Plaintiff and Respondent.

OPINION
IKOLA, J.
This appeal sits at the intersection of two topical, controversial legal issues: sex offender registration and the right to a jury trial. The Legislature and the voters have drastically expanded the reach and ramifications of sex offender registration in recent years, culminating in "The Sexual *515 Predator Punishment and Control Act: Jessica's Law" (Jessica's Law), approved in 2006 as Proposition 83.[1] The United States Supreme Court has revitalized the right to a jury trial over the same period, culminating in decisions striking down the federal sentencing guidelines in 2005 and California's determinate sentencing law (DSL) in 2007. Juries, not judges, must determine any additional facts necessary to impose punishment beyond that otherwise provided by statute based solely on the jury's verdict.
Here, the jury acquitted defendant Steven Lloyd Mosley of the only sexual offense charged against him. Yet the court made its own findings and ordered defendant to register as a sex offender. By itself, registration is "regulatory" and "remedial," not punitive. (People v. Castellanos (1999) 21 Cal.4th 785, 796 [88 Cal.Rptr.2d 346, 982 P.2d 211] (Castellanos).)
But Jessica's Law increased the punitive effect of sex offender registration by imposing a residency restriction. It restricts registered sex offenders from residing within 2,000 feet of a school or park where children gather, potentially banishing them from whole neighborhoods or even entire cities.
Jessica's Law survives this opinion untouched. We note only that its residency restriction increases the penalty for the underlying offense beyond the statutory maximum, and so the facts supporting sex offender registration must be found beyond a reasonable doubt by a jury. Imposing a residency restriction based on judicial factfinding violates the right to a jury trial as construed by the United States Supreme Court. (Apprendi v. New Jersey (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 120 S.Ct. 2348] (Apprendi).)
In this anomalous casewhere the jury acquitted defendant of any sexual offense, but the court subjected defendant to the residency restriction by requiring sex offender registration based on its own factfindingwe affirm defendant's conviction on the underlying offense, misdemeanor assault. But we must reverse the imposition of the registration requirement. We modify the judgment by striking the sex offender registration requirement and affirm the judgment as modified.

FACTS

The Incident
L.C. met defendant in June 2003, while she was visiting her grandmother at an Anaheim apartment complex. Defendant was a friend of a boy *516 named B.J., who lived at the apartment complex and whom L.C. had met earlier. L.C.'s grandmother and aunt were sitting down by the pool one night while L.C. hung out with her older brother, B.J., and defendant. L.C. told defendant she was 12 years old. They talked for about 10 minutes, then L.C. went back inside her grandmother's apartment. Later that night, L.C. went to the laundry room. She ran into B.J. and defendant on her way back. Defendant walked up behind her and, when she turned around, he gave her "basically just like a peck" of a kiss. L.C. went back to her grandmother's apartment.
Either the next day or a few days later, L.C. was getting ready to leave her grandmother's apartment and return home to northern California. That afternoon, she was in the apartment building's carport watching her younger cousin ride his scooter. Defendant walked up to her.
Moments later, L.C.'s grandmother went out to check on L.C. She saw defendant reaching out for L.C. and trying to kiss her while she was backing away. His hands touched her somewhere on her upper body. Her grandmother called out to them. Defendant pushed L.C. away and ran off. L.C. went into her grandmother's apartment. The grandmother later told a defense investigator L.C. had asked her, "Please don't tell my mother."
Weeks later, back home in northern California, L.C. told her father defendant had sexually assaulted her. Her father called the local county sheriff's office. A deputy sheriff interviewed L.C. She told him she was standing at the carport when defendant grabbed her arms, pushed her against a pole, leaned against her, and grabbed her buttocks and breasts. They slid off the pole, and defendant forced her backwards against a wall. He pulled down his shorts, "unbuckled" her shorts, and raped her for five minutes. L.C. told the deputy her grandmother and brother came to the carport; she explained the two of them could only see L.C.'s and defendant's heads because they were hidden behind a car. She did not tell the deputy defendant had kissed her before. She did not tell the deputy defendant kissed her on her neck in the carport.
An Orange County Sheriff's Office investigator interviewed L.C. the next week. L.C. told the investigator she had kissed defendant the day before the incident at the carport. She told him defendant walked up to her at the carport and immediately grabbed her, without talking to her first. Defendant pinned her against a pole, then pushed her against a wall. They were partly hidden behind a car. She mumbled when the investigator asked to clarify details about the sexual assault. The investigator spoke to L.C. again in June 2005 and September 2005. In one of these interviews, L.C. claimed defendant grabbed her and kissed her on the stairs to the laundry room the day before *517 the carport incident. In the September 2005 interview, L.C. did not mention defendant pushing her against a pole in the carport. The grandmother told the investigator at a June 2005 interview she saw defendant hugging and kissing L.C.
In October 2005, the Orange County District Attorney charged defendant by information with one count of committing a lewd act upon a child under 14. (Pen. Code, § 288, subd. (a).) The district attorney later amended the information to include a count of unlawful sexual intercourse (§ 261.5, subd. (c)), but dismissed that count during jury selection.

The Trial
L.C. testified at the January 2007 trial. She stated defendant had kissed her once before the carport incident, a detail she left out from her first police interview. She testified defendant walked up to her at the carport, and they "were just talking about stuff like what he was doing andfor the past couple days." She later testified her two brothers were with her when defendant approached her at the carport, but they left. Defendant started kissing her neck and tried to kiss her on the mouthhe did not grab her initiallybut she moved off of the pole against which she had been leaning and backed away from him. Defendant pursued her into a corner. He put his hand down her pants and grabbed her buttocks, rubbed her between her legs, "had both of his hands on [her] wrists where [she] couldn't move," put a hand up her shirt and bra, pulled his shorts down, and unzipped her "skort" (shorts that look like a skirt) and pulled one of its legs to the side. He inserted his penis into her vagina "for about maybe two minutes." Her grandmother walked up and yelled at defendant. L.C. initially testified defendant pulled up his shorts and fled, but later testified he had already pulled up his shorts before her grandmother arrived. Her grandmother asked her, "What were you doing? Why was he standing that close to you?"
L.C.'s grandmother also testified. She stated she went out to the carport to check on L.C. and her little brothers because she had seen the boys running around and wanted to know exactly where they were. She did not remember either boy coming to get her. The grandmother recanted her statement to the police about seeing defendant hugging and kissing L.C. Instead, she testified defendant and L.C. were "struggling," which she clarified as defendant reaching towards L.C. and touching her somewhere on the upper body. The grandmother could see defendant still had his shorts up; she could not see his underwear or buttocks. L.C.'s clothing did not seem out of order, and her grandmother did not recall L.C. having to rearrange it. L.C. seemed scared to her grandmother, but was not crying. The grandmother denied L.C. had asked her, "Please don't tell my mother."
*518 L.C.'s brothers also testified. One testified he saw L.C. standing with her back to the post, while defendant had his shorts down around his knees. He could see defendant's underwear. The other brother testified he saw L.C. standing with her back to the wall, while defendant had his shorts and his underwear down around his knees. He could see defendant's bare buttocks. Upon seeing this, the brother hopped off his skateboard and walkednot ranback to the apartment to get the grandmother. He told her, "there's this guy out there on [L.C.] and she keeps telling him no." The brother testified the grandmother "ran out there" to get L.C. As L.C. walked back to the apartment after defendant ran off, she was crying.
The defense closing argument focused on witness credibility. Defense counsel stated, "I told you in my opening, credibility is the issue here. . . . It all boils down to the witnesses and whether or not you believe them." Defense counsel walked the jury through L.C.'s and her grandmother's statements to the police and the trial testimony of L.C., her grandmother, and the brothers, pointing out discrepancies among the accounts. She stated, "[t]hey're not little inconsistencies. . . . These are big inconsistencies that matter."
Defense counsel urged the jury to consider finding defendant guilty of the lesser included offense of simple assault. (§ 240.) She argued, "There's also another lesser included offense that the district attorney did not tell you about, which will be in your [jury instruction] packet. It's simple misdemeanor battery [sic]. [¶] If you were to believe, say, grandma's testimony that she gave in court, if you believe grandma's testimony that [defendant] was reaching for [L.C.] or that in any way he touched her, that would be a battery [sic], if there's any touching."[2]
After a couple hours of deliberation, the jury found defendant guilty only of assault. It acquitted him of committing a lewd act on a minor. The court released defendant on his own recognizance until sentencing. It later sentenced defendant to serve six months in the county jail, with 180 days credit for time served.
Although the jury found defendant not guilty of any sexual offense, the court ordered defendant to register as a sex offender. (Former § 290, subd. (a)(2)(E); see § 290.006.) It noted, "We simply don't know what the jurywhy the jury acquitted the defendant. It's certainly not obvious that they disbelieved the witnesses." It considered, but rejected as unreliable, a psychologist's report stating defendant is not a pedophile or sexually violent predator and "has not manifested any unusual sexual deviation . . . ."
*519 The court found "the evidence established beyond a reasonable doubt that the defendant sexually assaulted the victim." It noted L.C.'s "truthful and sincere" testimony that defendant "grabbed her, kissed her, fondled her breasts, buttocks and the area between her legs, dropped his pants and inserted his penis into her vagina." It noted L.C.'s grandmother testified to seeing defendant struggle with L.C., and her brothers testified to seeing defendant with his pants down. It found defendant was "even more likely" driven by sexual compulsion because he assaulted L.C. in an open carport, and the assault was "not an isolated incident" because he kissed her once before. It concluded, beyond a reasonable doubt, "the assault in this case was committed as a result of sexual compulsion or for purposes of sexual gratification." In addition, it found registration appropriate because defendant was physically dangerous to the public, at serious risk to reoffend, and not being treated for his sexual compulsion. It stayed registration pending appeal.

DISCUSSION
Defendant challenges only the sex offender registration, not the underlying misdemeanor assault conviction. In his opening brief, he contended sex offender registration was unwarranted by "the facts of this case,"[3] constituted cruel and unusual punishment, and violated his right to a jury trial as construed in Cunningham v. California (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856]. He based his claims on the "`substantial' and `onerous'" burden of lifetime registration under California's sex offender registration laws. (Hofsheier, supra, 37 Cal.4th at p. 1197.) He conceded the court in Castellanos held that registration is not punishment. (Castellanos, supra, 21 Cal.4th at p. 796.)
In his reply brief, defendant invoked Jessica's Law for the first time. He noted its residency restriction provision barred registered sex offenders from *520 residing within 2,000 feet of any public or private school, or park where children regularly gather. (§ 3003.5, subd. (b).) He asserted "[t]his harsh change in circumstances calls for a re-examination" of whether sex offender registration constitutes punishment.
At our invitation, the parties filed supplemental briefs on whether defendant was subject to Jessica's Law's residency restriction and, if so, whether it constitutes punishment implicating defendant's right to a jury trial. We also granted defendant's request and accepted additional briefs from the parties on whether the residency restriction constitutes cruel and unusual punishment.[4]

Sex Offender Registration and Jessica's Law
California law has provided for sex offender registration for more than 60 years. (See Wright v. Superior Court (1997) 15 Cal.4th 521, 526 [63 Cal.Rptr.2d 322, 936 P.2d 101].) The Legislature enacted section 290 in 1947, requiring persons convicted of certain sexual offenses to provide a written statement, fingerprints, and a photograph to county law enforcement, and to inform law enforcement of any change of address. (Stats. 1947, ch. 1124, § 1, pp. 2562-2563.) Sex offender registration proceeded uneventfully over the following decades, with little tinkering with the registration rules. The Wright court could correctly observe section 290, even as late as 1994, was still "part of a comprehensive scheme enacted in 1947 [that] assumed substantially its present form in 1950." (Wright, at p. 526.)
In 1994, however, the Legislature extended the scope of sex offender registration. Until then, section 290 provided for "mandatory registration" of persons convicted of specified sexual offensesthose persons, and only those persons, had to register. (Hofsheier, supra, 37 Cal.4th at 1196-1197; former § 290, subd. (a)(1)(A).)[5] The 1994 amendment allowed for "discretionary registration." (Hofsheier, at pp. 1196-1198.) It granted the court discretion to order sex offender registration for persons convicted of "any offense . . . if the court finds . . . the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification." (Stats. 1994, ch. 867, § 2.7, p. 4390, former § 290, subd. (a)(2)(E).)[6] Thus, "discretionary registration does not depend on the specific crime of which a defendant was convicted. Instead, the trial court may require a defendant to register . . . even if the defendant was not convicted of a sexual offense." (Hofsheier, supra, 37 Cal.4th at pp. 1197-1198, citation omitted.)
*521 In 1999, the California Supreme Court held in Castellanos that sex offender registration did not violate the federal and state constitutional bars against ex post facto laws because it does not constitute punishment. (Castellanos, supra, 21 Cal.4th at p. 796.) It noted, "the method of analyzing what constitutes punishment varies depending upon the context in which the question arises. But two factors appear important in each case: whether the Legislature intended the provision to constitute punishment and, if not, whether the provision is so punitive in nature or effect that it must be found to constitute punishment despite the Legislature's contrary intent." (Id. at p. 795.)
As for the first factorlegislative intentthe Castellanos court found, "[t]he sex offender registration requirement serves an important and proper remedial purpose, and it does not appear that the Legislature intended the registration requirement to constitute punishment." (Castellanos, supra, 21 Cal.4th at p. 796.) It noted, "[T]he sex offender registration requirement `is intended to promote the "`state interest in controlling crime and preventing recidivism in sex offenders.'" [Citation.] As [the Supreme Court] consistently has reiterated: "The purpose of section 290 is to assure that persons convicted of the crimes enumerated therein shall be readily available for police surveillance at all times because the Legislature deemed them likely to commit similar offenses in the future. [Citation.]" [Citations.] . . . [¶] . . . The statute is thus regulatory in nature, intended to accomplish the government's objective by mandating certain affirmative acts.'" (Ibid.)
As for the second factorpunitive effectthe Castellanos court found, "[n]or is the sex offender registration requirement so punitive in fact that it must be regarded as punishment, despite the Legislature's contrary intent. Although registration imposes a substantial burden on the convicted offender, this burden is no more onerous than necessary to achieve the purpose of the statute." (Castellanos, supra, 21 Cal.4th at p. 796.) The registration burden at issue was substantially similar to the original 1947 registration law: the "lifelong" requirement to "furnish[] to the chief of police of the city in which the offender resides (or to the sheriff of the county, if the offender resides in an unincorporated area) a written statement, fingerprints, and a photograph, which are forwarded to the California Department of Justice." (Id. at p. 790.)
In 2006, the voters approved Jessica's Law. Section 1 provides its short title, "The Sexual Predator Punishment and Control Act: Jessica's Law." (Ballot Pamp., Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 1, p. 127.) Its official title on the ballot, prepared by the Attorney General, is "Sex Offenders. Sexually Violent Predators. Punishment, Residence Restrictions and Monitoring. Initiative Statute." (Id., official title and summary of Prop. 83, p. 42.)
*522 Jessica's Law made dozens of changes to the laws regarding sex offender registration and sexually violent predators. As the Legislative Analyst noted in the ballot analysis, Jessica's Law "Increase[s] Penalties for Sex Offenses" by "broaden[ing] the definition of certain sex offenses," "provid[ing] for longer penalties for specified sex offenses," "prohibit[ing] probation in lieu of prison for some sex offenses," "eliminat[ing] early release credits for some inmates convicted of certain sex offenses," "extend[ing] parole for specified sex offenders," "generally mak[ing] more sex offenders eligible for an SVP commitment," and "chang[ing] the standard for release of SVPs from a state mental hospital." (Ballot Pamp., Gen. Elec., supra, analysis of Prop. 83 by the Legislative Analyst, pp. 43-44, italics omitted.)
Jessica's Law imposed new burdens on registered sex offenders. It amended section 3003.5 to add a residency restriction for registered sex offenders. (Ballot Pamp., Gen. Elec., supra, text of Prop. 83, § 21, p. 135.) It added a subdivision providing, "Notwithstanding any other provision of law, it is unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." (Ibid., italics omitted; § 3003.5, subd. (b).) It also added a subdivision providing, "Nothing in this section shall prohibit municipal jurisdictions from enacting local ordinances that further restrict the residency of any person for whom registration is required pursuant to Section 290." (§ 3003.5, subd. (c).) Other increased restrictions on registered sex offenders included requiring certain sex offenders to be monitored for life by global positioning system, at their expense. (Ballot Pamp., Gen. Elec., supra, text of Prop. 83, § 22, p. 135; § 3004, subds. (b), (c).)
In October 2007, the Legislature "reorganize[d] and renumber[ed]" the sex offender registration laws. (Legis. Counsel's Dig., Sen. Bill No. 172 (2007-2008 Reg. Sess.) 9 Stats. 2007, ch. 579.) Former section 290 was repealed and its provisions re-enacted as sections 290 through 290.023. (Legis. Counsel's Dig., Sen. Bill No. 172 (2007-2008 Reg. Sess.) 9 Stats. 2007, ch. 579.)

Apprendi and the Right to a Jury Trial

Starting in the late 1990's, the United States Supreme Court has scrutinized the interplay between the Sixth Amendment's right to a jury trial and laws directing judges to engage in their own factfinding when determining whether to impose "enhanced" punishment at sentencing. (See Jones v. United States (1999) 526 U.S. 227, 229, 239-241, 243, fn. 6 [143 L.Ed.2d 311, 119 S.Ct. 1215] [construing federal carjacking statute to set forth distinct offenses, not sentencing options; contrary construction would raise dubious constitutional issue of whether judicial factfinding may increase otherwise maximum *523 punishment]; Almendarez-Torres v. United States (1998) 523 U.S. 224, 243 [140 L.Ed.2d 350, 118 S.Ct. 1219] [court may increase sentence due to defendant's prior conviction; recidivism is "a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence"].)
(1) In Apprendi, the court held, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Apprendi, supra, 530 U.S. 466, 490.) It reversed the defendant's convictions for unlawful weapon possession, to which he had pleaded guilty, because the court imposed a sentence enhancement based on its own findings the crimes were motivated by racial bias. (Id. at pp. 469-471.) It observed the rights to due process and trial by jury in criminal matters"constitutional protections of surpassing importance" (id. at p. 476)together "indisputably entitle a criminal defendant to `a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt'" (id. at p. 477).
This entitlement applied equally to elements of a crime and any "enhancements" to the crime used to impose additional punishment. (Apprendi, supra, 530 U.S. at p. 476.) It noted the state "threatened [the defendant] with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race. As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect [the defendant] from unwarranted pains should apply equally to the two acts . . . ." (Ibid.) "If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should notat the moment the State is put to proof of those circumstancesbe deprived of protections that have, until that point, unquestionably attached." (Id. at p. 484.) "`[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.'" (Id. at p. 490.)
(2) The Supreme Court explored the concept of "the prescribed statutory maximum" punishment for a crime in later cases. In Blakely v. Washington (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (Blakely), the court held "the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (Id. at p. 303.) It continued, "When a judge inflicts punishment that the jury's verdict alone does not *524 allow, the jury has not found all the facts `which the law makes essential to the punishment,' [citation], and the judge exceeds his proper authority." (Id. at p. 304.) Thus, "every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." (Id. at p. 313.)
In United States v. Booker (2005) 543 U.S. 220 [160 L.Ed.2d 621, 125 S.Ct. 738] (Booker), the court held the federal sentencing guidelines violated the right to a jury trial by allowing the court to impose sentence enhancements based on its own factfinding, and severed the guideline provisions that made them mandatory. (Id. at pp. 226-227.) It rejected the contention the sentencing guidelines, promulgated by a commission, set no "statutory" maximum punishments at all. (Id. at pp. 237-238.) "The simple answer, of course, is that we were only considering a statute in [Apprendi]. It was therefore appropriate to state the rule in that case in terms of a `statutory maximum'. . . ." (Id. at p. 238.) The court emphasized, "More important than the language used in our holding in Apprendi are the principles we sought to vindicate" (id. at p. 238), such as avoiding "`arbitrary punishments upon arbitrary convictions' without the benefit of a jury . . ." (id. at pp. 238-239).
And in Cunningham, the Supreme Court held California's then operative DSL[7] violated the right to trial by jury by "allow[ing] a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (Cunningham v. California, supra, 549 U.S. at p. ___ [127 S.Ct. at p. 860].) The midterm of a DSL sentencing triad was "the relevant statutory maximum" punishment based upon facts essential to a guilty verdict or plea; imposing an upper term based on aggravating circumstances "found by the judge, not the jury . . . violates Apprendi's bright-line rule: Except for a prior conviction, `any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" (549 U.S. at p. ___ [127 S.Ct. at p. 868].)

The Intent/Effect Test for Determining What Constitutes an Increase in Penalty "Beyond the Prescribed Statutory Maximum"
The issue is this: Does imposing Jessica's Law's residency restriction on defendant, based upon the court's finding he committed assault due to sexual compulsion and for sexual gratification, "increase[] the penalty for [his] crime beyond the prescribed statutory maximum[?]" (Apprendi, supra, 530 U.S. at p. 490.) If so, Apprendi would require the facts supporting the imposition of the residency restriction be proved beyond a reasonable doubt to a jury. No *525 court has considered whether a sex offender residency restriction triggers the right to a jury trial under Apprendi.[8]
The United States Supreme Court has not definitively construed the word "penalty" as used in Apprendi. Apprendi itself considered a sentence enhancement requiring a longer prison term for persons who committed their offenses while motivated by racial bias. Longer prison terms based upon court-found facts were also at issue in Blakely, Booker, and Cunningham. But these cases did not expressly limit the right to a jury trial only to facts supporting longer prison terms. Apprendi used the broader word "penalty" in its famous phrase. (Apprendi, supra, 530 U.S. at p. 490.) At other points, it discussed the "certain pains" that attach to the underlying offense and the "additional pains" that the court may impose at sentencing. (Id. at p. 476.) It later referred to the "punishment beyond that provided by statute" that "heighten[s]" "both the loss of liberty and the stigma attaching to the offense." (Id. at p. 484.) And in Booker, the court insisted "the principles we sought to vindicate" (Booker, supra, 543 U.S. at p. 238) in Apprendi, such as avoiding "`arbitrary punishments upon arbitrary convictions' without the benefit of a jury" (id. at pp. 238-239), are "[m]ore important than the language used in our holding in Apprendi . . ." (id. at p. 238).
Apprendi and its progeny do not rule out the residency restriction as one type of sentencing option that may trigger the right to a jury trial. To the contrary, and at first blush, the ban against living within 2,000 feet of a school or park could easily be considered a "penalty," "pain," or "punishment" that increases "the loss of liberty and the stigma attaching to the offense." (Apprendi, supra, 530 U.S. at pp. 476, 484, 490.) But we must ascertain this within some analytical framework more rigorous than first blushes.[9]
Castellanos relied upon two "important" determinants in holding sex offender registration (without the residency restriction) does not constitute *526 punishment for ex post facto analysis.[10] (Castellanos, supra, 21 Cal.4th at p. 795.) The factors were "whether the Legislature intended the provision to constitute punishment" and "whether the provision is so punitive in nature or effect that it must be found to constitute punishment despite the Legislature's contrary intent." (Ibid.) We term this the "intent/effect" test.
Castellanos also noted many ex post facto cases, but not all, determine the second prongpunitive effectby using a "multifactor test articulated in Kennedy v. Mendoza-Martinez [(1963)] 372 U.S. 144 [9 L.Ed.2d 644, 83 S.Ct. 554]." (Castellanos, supra, 21 Cal.4th at p. 795, fn. 5.) Castellanos found its two factors to be "crucial," and bypassed the Mendoza-Martinez factors without rejecting them. (Castellanos, at pp. 795-796, fn. 5.) It quickly concluded mere registration had no punitive effect because the "substantial burden on the convicted offender . . . is no more onerous than necessary to achieve the purpose of the statute." (Id. at p. 796.)
Justice Kennard wrote separately, asserting the majority "misdescribe[d] the United State Supreme Court's current jurisprudence interpreting the ex post facto clause." (Castellanos, supra, 21 Cal.4th at p. 800 (conc. & dis. opn. of Kennard, J.).) She criticized the majority for adopting the intent/effect test while "ignor[ing] that the Mendoza-Martinez factors are a central part of the second prong of that test." (Id. at p. 802 (conc. & dis. opn. of Kennard, J.).) Justice Kennard analyzed sex offender registration under the Mendoza-Martinez factors and concluded registration is not punishment. (Castellanos, at pp. 803-805 (conc. & dis. opn. of Kennard, J.).)
(3) Mendoza-Martinez held the laws divesting certain draft-evaders of citizenship without trial constituted punishment and violated the Fifth and Sixth Amendments. (Kennedy v. Mendoza-Martinez, supra, 372 U.S. at pp. 165-167 (Mendoza-Martinez).) It noted, "The punitive nature of the sanction here is evident under the tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character . . . . Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishmentretribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions." (Id. at pp. 168-169, fns. omitted.) The United States Supreme Court has since repeatedly turned to *527 these factors when determining whether a sanction is punishment for purposes of the double jeopardy or ex post facto clauses. (See, e.g., Kansas v. Hendricks (1997) 521 U.S. 346, 361 [138 L.Ed.2d 501, 117 S.Ct. 2072]; Hudson v. United States (1997) 522 U.S. 93, 99 [139 L.Ed.2d 450, 118 S.Ct. 488].)
The United States Supreme Court again applied the Mendoza-Martinez factors in Smith, holding Alaska's sex offender registration law (which lacked a residency restriction) did not violate the federal Constitution's ex post facto clause.[11] (Smith v. Doe (2003) 538 U.S. 84, 97 [155 L.Ed.2d 164, 123 S.Ct. 1140] (Smith).) It stated, "Because we `ordinarily defer to the legislature's stated intent,' [citation] `"only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.'" (Smith, supra, at p. 92.) "In analyzing the effects of the Act we refer to the seven factors noted in [Mendoza-Martinez], as a useful framework. These factors, which migrated into our ex post facto case law from double jeopardy jurisprudence, have their earlier origins in cases under the Sixth and Eighth Amendments, as well as the Bill of Attainder and the Ex Post Facto Clauses. [Citation.] Because the Mendoza-Martinez factors are designed to apply in various constitutional contexts, we have said they are `neither exhaustive nor dispositive,' [citations], but are `useful guideposts. . .' . . . . The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraints; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." (Id. at p. 97, citation omitted.)
One of our sister courts recently applied the Mendoza-Martinez factors to California's sex offender registration laws, holding the public notification requirement (§ 290.46) did not constitute a punishment triggering the right to a jury trial. (People v. Presley (2007) 156 Cal.App.4th 1027, 1033-1035 [67 Cal.Rptr.3d 826] (Presley).) To our knowledge, Presley is the first case in the country to use the Mendoza-Martinez factors for determining whether Apprendi applies to a particular sanction. Its approach is sound.
We will follow the United States Supreme Court's lead and Presley's recent example and use the Mendoza-Martinez factors to decide whether *528 Jessica's Law's residency restriction constitutes punishment under the intent/effect test, and thus a penalty beyond the statutory maximum under Apprendi.[12]

Jessica's Law's Residency Restriction Constitutes a Penalty Due to Its Punitive Effect
(4) We start by assessing punitive intent, the first prong of the intent/effect test. The most obvious starting point is Proposition 83's intent clause. (See Smith, supra, 538 U.S. at p. 93 [express statement in statutory text may reveal intent].) It refers in places to punishing sex offenders, though not in connection with the residency restriction. Instead, it and the ballot pamphlet state the residency restriction is intended to control registered sex offenders and create predator free zones around our children's schools and parks.
Nonetheless, other factors indicate the voters intended the residency restriction to be punitive. Proposition 83 provided for codification of the residency restriction in the Penal Code, and renders residing near schools or parks "unlawful" for registered sex offenders. (See Smith, supra, 538 U.S. at p. 94 ["manner of its codification or the enforcement procedures" may reveal intent].) The residency restriction's blanket treatment of all registered sex offenders, lack of a grandfather clause or grace period, and authorization of local ordinances imposing stricter restrictions, further suggest a punitive intent.
This issue is close, pitting the express statement of regulatory intent against several provisions implying a punitive intent. We will defer to the express statement, narrowly concluding the residency restriction lacks a punitive intent.[13]
We turn to assessing punitive effect, the second prong of the intent/effect test. As the Smith court did, we will focus on the five most salient Mendoza-Martinez factors. (Smith, supra, 538 U.S. at p. 97; accord Castellanos, supra, 21 Cal.4th at pp. 803-805 (conc. & dis. opn. of Kennard, J.) [applying factors]; Presley, supra, 156 Cal.App.4th at pp. 1033-1035 [same].)
*529 Affirmative Disability or Restraint. The residency restriction affirmatively restrains the rights of registered sex offenders to choose where to live and make decisions concerning their families. It "clearly increases the penalty applied to affected sex offenders by preventing those offenders from residing and taking full advantage of their ownership rights in property." (State v. Pollard (Ind.App. 2008) 886 N.E.2d 69, 74 [residency restriction is punitive].) They cannot stay in their own home if it happens to fall within an exclusion zone, no matter how long they lived therethere is no grandfather clause, grace period, or exceptions.[14] They cannot live with relatives who live in an exclusion zone. And if they have families of their own, they face the unpleasant choice between living away from their families or uprooting their families and relocating. And relocation may be impossible or impracticable given the sweeping extent of the zone of exclusion. They cannot move to housing near a school or park, no exceptions. This restricts more than their housing choice. It limits their access to jobs, public transportation, medical care, and rehabilitation programs. (See Mikaloff v. Walsh (N.D. Ohio, Sept. 4, 2007, No. 5:06-CV-96) 2007 WL 2572268 (Mikaloff) [residency restriction is punitive].)
The residency restriction also subjects registered sex offenders to the constant threat of ouster if a school or park opens nearby. The Georgia Supreme Court noted the possibility that community groups may deliberately set up private schools to force offenders to move away. (Mann v. Georgia Dept. of Corrections (Ga. 2007) 653 S.E.2d 740, 756 (Mann).) The residency restriction "looms over every location appellant chooses to call home" (id. at p. 759), as "there is no place in [the state] where a registered sex offender can live without being continually at risk of being ejected" (id. at p. 755). "[S]ubjecting a sex offender to constant ouster from his or her home seems a significant deprivation of liberty and property interests. It sentences them to a life of transience, forcing them to become nomads." (Mikaloff, supra, 2007 WL 2572268 at p. *10.) This factor tips heavily toward punitive effect.
The Attorney General notes defendant has not shown the residency restriction has forced him to relocate. That is unsurprising; the court stayed registration pending appeal. Without the stay, defendant's right to relocate would be currently limited, and he would face the present threat of forced relocation should a school or park open near his residence. And more basically, the right to a jury trial cannot depend on where a particular *530 defendant lives. The residency restriction constitutes a heavy affirmative restraint, regardless of where defendant calls home.
History and Tradition as Punishment. The residency restriction is a novel measure. But it is akin to banishment, a traditional form of punishment. (Smith, supra, 538 U.S. at p. 98.) Like banishment, the residency restriction permanently excludes registered sex offenders from certain neighborhoods and hinders their acceptance into new ones. (Ibid. [discussing banishment].) To be sure, as the Attorney General notes, the residency restriction is unlike banishment in that offenders are not expressly excluded from any political subdivision. But the common thread of exclusion from a given area is the same. And in light of the large number of schools and parks in our communities and the size of the 2,000-foot exclusion zone, the residency restriction may well have the effect of banishing registered sex offenders from densely populated cities. One commentator reports that Jessica's Law "effectively banned registered sex offenders from residing in half of the Sacramento urban area, nearly seventy percent of the San Francisco Bay area, and about seventy-five percent of the Los Angeles metro area." (Barvir, When Hysteria and Good Intentions Collide: Constitutional Considerations of California's Sexual Predator Punishment and Control Act (2008) 29 Whittier L.Rev. 679, 687; see Doe v. Miller (8th Cir. 2005) 405 F.3d 700, 724 (conc. & dis. opn. of Melloy, J.) (Miller) [Iowa residency restriction "cover[s] virtually the entire city area" of Des Moines and Iowa City and "[i]n smaller towns that have a school or childcare facility, the entire town is often engulfed by the excluded area"].)
The residency restriction is also akin to the traditional punishments of property deprivation and probation or parole. (Nixon v. Administrator of General Services (1977) 433 U.S. 425, 474 [53 L.Ed.2d 867, 97 S.Ct. 2777] ["`pains and penalties' historically" comprising punishment for bill of attainder analysis "commonly included . . . imprisonment, banishment, and the punitive confiscation of property by the sovereign" (fns. omitted)]; Morrissey v. Brewer (1972) 408 U.S. 471, 477 [33 L.Ed.2d 484, 92 S.Ct. 2593] ["parole is an established variation on imprisonment"].) It threatens to deprive registered sex offenders of the use and enjoyment of any real property they own near schools and parks. (Mann, supra, 653 S.E.2d at p. 760 [residency restriction is an uncompensated regulatory taking]; State v. Pollard, supra, 886 N.E.2d at p. 74 [residency restriction "prevent[s] offenders from residing and taking full advantage of their ownership rights in property"].) And while parole and probation empower the state to approve a released convict's residence on a case-by-case basis for a limited time, Jessica's Law broadly disapproves all registered sex offenders from residing near schools or parks for the rest of their lives. (See Mikaloff, supra, 2007 WL 2572268 at *531 pp. *9-*10 [residency restriction is "analogous to" probation and parole, but even "more onerous"].) The residency restrictionthe exclusion of registered sex offenders from residing near schools and parksis sufficiently close to banishment, property deprivation, and a probation condition to be deemed traditional punishment. This factor weighs in favor of punitive effect.
Traditional Aims of Punishment. The traditional aims of punishment are deterrence and retribution. (Mendoza-Martinez, supra, 372 U.S. at p. 168; Smith, supra, 538 U.S. at p. 102.) The residency restriction arguably seeks retribution against registered sex offenders, as the same factors that imply a punitive intent also suggest a desire to seek "`vengeance for its own sake.'" (Doe, supra, 189 P.3d at p. 1013, fn. 107.) But just as we narrowly concluded the residency restriction lacks a punitive intent, we also hold it lacks a retributive effect. On the other hand, the residency restriction is concededly designed to deter recidivism. This factor tips toward punitive effect.
Rational Connection to Nonpunitive Purpose. The residency restriction is rationally connected to the nonpunitive purpose of protecting children in and around schools and parks. This factor weighs against punitive effect.
Excessiveness with Respect to Nonpunitive Purpose. The residency restriction is excessively broad with regard to the protection of children by schools and parks. It affects all registered sex offenders equally, even those whose offenses did not involve children. Its 2,000-foot geographic scope creates expansive exclusion zones around the tens of thousands of schools and parks in California. It is poised to exclude registered sex offenders from neighborhoods, cities, or even entire metropolitan areas, crowding offenders into the same limited number of school-less, park-less areas. But it does not bar registered sex offenders from living near childrenjust schools and parks. Thus, whatever the danger posed by registered sex offenders, the residency restriction shifts that danger from children living in desirable neighborhoods near schools and parks to children who live in outlying areas. (Mikaloff, supra, 2007 WL2572268 at p. *11.) The residency restriction allows registered sex offenders to loiter around schools and parks during the day while children are out, as long as they go somewhere else at night, when children have gone home. (Ibid.) Barring all registered sex offenders from living near any schools and parkswithout considering whether their offenses involved children, whether the exclusion zone provides adequate alternate housing for them, or whether their exclusion from living near schools and parks provides substantial protection to our childrenis excessive to the nonpunitive purpose of child protection. This factor weighs in favor of punitive effect.
*532 The Attorney General relies on unpersuasive cases. Its three main cases held the punitive effect of other states' residency restrictions did not outweigh their nonpunitive intent, and so did not violate the ban on ex post facto laws. (Miller, supra, 405 F.3d at pp. 719-723; People v. Leroy (2005) 357 Ill.App.3d 530 [293 Ill.Dec. 459, 828 N.E.2d 769, 782] (Leroy) [same]; Lee v. State (Ala.Crim.App. 2004) 895 So.2d 1038, 1043-1044 (Lee).)[15]
We disagree with the analysis in these cases. In considering the first factor, traditional punishment, the cases miss the similarity between the residency restriction and property deprivation, probation, and parole, limiting their analysis to banishment. (Miller, supra, 405 F.3d at p. 719; Leroy, supra, 828 N.E.2d at p. 780; Lee, supra, 895 So.2d at p. 1043.) They then construe banishment too narrowly, demanding express exclusion from a community. (Miller, supra, 405 F.3d at p. 719; Leroy, supra, 828 N.E.2d at p. 780.) They do not consider whether the residency restrictions would have that effecta glaring omission from an analysis of punitive effect. And they demand evidence the residency restriction has excluded the defendant from his home, concluding that, absent such evidence, the residency restriction must not affect anyone. (Leroy, supra, 828 N.E.2d at p. 780; Lee, supra, 895 So.2d at p. 1043.) The cases also unreasonably dismiss the second factor, the traditional aims of punishment. They discount the residency restriction's deterrent effect with the banal observation that even nonpunitive statutes may deter crime. (Miller, supra, 405 F.3d at p. 720; Lee, supra, 895 So.2d at p. 1043; Leroy, supra, 828 N.E.2d at p. 781.) And they ignore the retributive effect of the residency restrictions by wrongly looking for a retributive intent. (Leroy, supra, 828 N.E.2d at p. 781 ["[t]here is no evidence that the [restriction] is designed as a form of retribution . . .," italics added].) This reasoning essentially throws the "traditional aims" factor out of the equation.
More basically, the Attorney General's cases refuse to weigh the various Martinez-Mendoza factors and collapse them into one: a rational relation to nonpunitive purpose. (Leroy, supra, 828 N.E.2d at p. 781 [affirmative disability "alone" does not confer punitive effect]; Miller, supra, 405 F.3d at pp. 720-721 [rejecting the "potentially retributive" effect because it "is consistent with the legislature's regulatory objective of protecting the health and safety of children," and passing over the conceded affirmative disability by stating it "ultimately points us to the importance of the next inquiry: whether the law is rationally connected to a nonpunitive purpose, and whether it is excessive in relation to that purpose"].) We acknowledge this *533 may be the "`[m]ost significant'" factor. (Smith, supra, 538 U.S. at p. 102.) But that does not excuse skipping over any other factor or ignoring whether, collectively, the factors indicate a punitive effect.

Conclusion: Because the Residency Restriction Imposes a Penalty Beyond the Prescribed Statutory Maximum, It Triggers the Right to a Jury Trial
We conclude, based on our analysis of the salient Mendoza-Martinez factors, Jessica's Law's residency restriction has an overwhelming punitive effect. It effectuates traditional banishment under a different name, interferes with the right to use and enjoy real property near schools and parks, and subjects housing choices to government approval like parole or probation. It affirmatively restrains the right to choose a home and limits the right to live with one's family. It deters recidivism and comes close to imposing retribution on offenders. While it has a nonpunitive purpose of protecting children, it is excessive with regard to that purpose. It would oust a person never convicted of any offense against a child from his family home near a school or park, forcing him to leave his family or consigning the family to perpetually threatened transience. Relocation would be limited to the few outskirts of town lacking a school or park. Yet the residency restriction would allow a convicted child molester to stroll past the school, eat ice cream in the park, and live next door to small childrenas long as he retreats at night to housing far from a school or park. Building exclusion zones around all schools and parks for all registered sex offenders is excessively punitive.
The severe punitive effect of Jessica's Law's residency requirement clearly outweighs the proclaimed lack of regulatory, nonpunitive intent. (See Smith, supra, 538 U.S. at p. 92 ["`"clearest proof"'" of punitive effect outweighs lack of punitive intent].) We are not the first jurists to recognize the overwhelming punitive effect of a residency restriction. (See State v. Pollard, supra, 886 N.E.2d at p. 74 [residency restriction is punitive]; Mikaloff, supra, 2007 WL 2572268 at pp. *9-*10 [same]; Leroy, supra, 828 N.E.2d at p. 793 (dis. opn. of Kuehn, J.) [same]; Miller, supra, 405 F.3d at p. 726 (conc. & dis. opn. of Melloy, J.) [same].)
(5) Because the residency restriction is punitive, its imposition by the court increases the penalty for a nonsexual offense beyond the prescribed statutory maximum based upon the jury verdict alone. (Apprendi, supra, 530 U.S. at p. 490.) Thus, the facts required to impose the residency restriction must be found beyond a reasonable doubt by a jury. (Ibid.) That was not done here.

*534 DISPOSITION
The judgment is modified by striking the sex offender registration requirement. We affirm the judgment as modified
O'Leary, Acting P. J., and Moore, J., concurred.
NOTES
[1] (Ballot Pamp., Gen. Elec. (Nov. 7, 2006) text of Prop. 83, pp. 127-138, at [as of Nov. 19, 2008]; see Pen. Code, § 3003.5, subd. (b).) All further statutory references are to the Penal Code.
[2] Defense counsel referred to battery as the lesser included offense on which the jury would be instructed. The jury was actually instructed on the lesser included offense of simple assault. (§§ 240, 241, subd. (a).)
[3] We reject this claim. The court has discretion to order sex offender registration for "any offense . . . if the court finds at the time of conviction or sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification." (Former § 290, subd. (a)(2)(E), italics added.) "[D]iscretionary registration does not depend on the specific crime of which a defendant was convicted. Instead, the trial court may require a defendant to register . . . even if the defendant was not convicted of a sexual offense." (People v. Hofsheier (2006) 37 Cal.4th 1185, 1197-1198 [39 Cal.Rptr.3d 821, 129 P.3d 29] (Hofsheier).) The court expressly found L.C. credible. "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (People v. Maury (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].) L.C.'s testimony sufficiently supports the findings that defendant assaulted her as a result of sexual compulsion and for purposes of sexual gratification. (Former § 290, subd. (a)(2)(E).) It also supports the court's reasons for imposing registration: defendant was physically dangerous to the public, at serious risk to reoffend, and not being treated for his sexual compulsion. (Ibid.) Thus, had these facts been found by a jury, the court unquestionably would have acted within its discretion by requiring registration.
[4] We need not reach this contention, given our holding.
[5] When defendant was sentenced, former section 290, subdivision (a)(1)(A), was still in effect. Mandatory registration is now provided for by section 290, subdivisions (b) and (c).
[6] When defendant was sentenced, former section 290, subdivision (a)(2)(E), was still in effect. Discretionary registration is now provided for by section 290.006.
[7] The California Legislature subsequently amended the DSL. (See § 1170, subd. (b).)
[8] The Oregon Court of Appeal held lifetime postprison supervision of persons found to be "sexually violent dangerous offenders" exceeded the otherwise maximum term, triggering the right to a jury trial. (State v. Hopson (2008) 220 Ore.App. 366 [186 P.3d 317, 373].) The court noted, but did not rely upon, a residency restriction imposed on such persons. (Id., 186 P.3d at p. 370.)
[9] Courts have struggled over whether restitution is a penalty triggering the right to a jury trial. (Compare U.S. v. Bonner (7th Cir. 2008) 522 F.3d 804, 807 [restitution is not punishment] with U.S. v. Leahy (3d Cir. 2006) 438 F.3d 328, 335, 338 [restitution is punishment, but no jury trial required because it does not increase sentence]; see generally Appleman, Retributive Justice and Hidden Sentencing (2007) 68 Ohio St. L.J. 1307, 1370-1384 [analyzing whether parole, postrelease supervision, or restitution increase penalty for offense].) These cases offer little guidance whether anything else, such as the residency restriction, constitutes an Apprendi penalty.
[10] Defendant does not contend Jessica's Law's residency restriction constitutes an improper ex post facto law. We do not reach this issue, which is now pending before the California Supreme Court. (In re J. (E.), S156933.)
[11] Also applying the Mendoza-Martinez factors, the Alaska Supreme Court recently held the same sex offender registration laws violated the state constitution's ex post facto clause. (Doe v. State (Alaska 2008) 189 P.3d 999, 1018-1019 (Doe).)
[12] At oral argument, the Attorney General conceded the usefulness and prevalence of the Mendoza-Martinez factors for determining punitive effect.
[13] Because the intent issue is so close, we wonder whether the residency restriction's nonpunitive intent may be outweighed only by "`"the clearest proof"'" of a punitive effect. (Smith, supra, 538 U.S. at p. 92; see id. at p. 110 (conc. opn. of Souter, J.) [questioning standard of review when indications of punitive and nonpunitive intent are in "equipoise"]; id. at p. 115 (dis. opn. of Ginsburg, J.) [rejecting standard altogether].) Nonetheless, our analysis adheres to this standard.
[14] (See State v. Finders (Iowa 2008) 743 N.W.2d 546, 549 [grandfather clause allowing registered sex offenders to stay in homes subject to residency restriction "avoid[s] the harsh effect of the retroactive application" and "`recognize[s] the inequity in forcing a registered sex offender who had established a residence prior to the enactment of the residency restriction law to relocate when, prior to the enactment of the law, he was considered to be in compliance with the law'"].)
[15] (See also Weems v. Little Rock Police Dept. (8th Cir. 2006) 453 F.3d 1010 [residency restriction not ex post facto law because no punitive intent or effect, following Miller]; People v. Morgan (2007) 377 Ill.App.3d 821 [317 Ill.Dec. 339, 881 N.E.2d 507] [same, following Leroy]; Graham v. Henry (N.D.Okla., Sept. 14, 2006, No. 06-CV-381-TCK-FHM) 2006 WL 2645130 [same].)