[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1092 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1093 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1094 
OPINION
We revisit defendant Steven Lloyd Mosley, who a jury acquitted of any sexual offense. The jury found him guilty only of misdemeanor assault. Yet the court ordered defendant to register as a sex offender based upon its own factual findings about his motivations — facts not proved beyond a reasonable doubt to the jury.
In a prior opinion, we held the facts supporting imposition of discretionary sex offender registration must be found beyond a reasonable doubt by a jury. Defendant has the right to a jury trial on any facts (other than a prior conviction) that increase his offense's penalty beyond the statutory maximum. (Apprendi v. New Jersey (2000) 530 U.S. 466,490 [147 L.Ed.2d 435, 120 S.Ct. 2348] (Apprendi).) The court's imposition of sex offender registration for misdemeanor assault effectively increased the penalty beyond the statutory maximum because of Jessica's Law, The Sexual Predator Punishment and Control Act, approved in 2006 as Proposition 83. Jessica's Law contains a residency restriction that bars registered sex offenders from residing within 2,000 feet of a school or park where children gather. This residency restriction constitutes punishment due to its overwhelmingly punitive effect.
The California Supreme Court directed that we reconsider the matter in light of In re E.J. (2010) 47 Cal.4th 1258 [104 Cal.Rptr.3d 165,223 P.3d 31] (E.J.), which addressed the imposition of the residency restriction as a parole condition. The Supreme Court held the residency restriction applied prospectively to four registered sex offenders paroled after passage of Jessica's Law. When imposed as a new parole condition on a person who already registered as a sex offender, the residency restriction "does not additionally punish for the [underlying] sex offense conviction. . . ." (47 Cal.4th at p. 1280.) But the Supreme Court had "no occasion . . . to address whether the 2,000-foot residency limit might apply . . . to the thousands of persons subject to sex offender registration who, for whatever reason, are not currently on parole." *Page 1095 
(Id. at p. 1285 (conc. opn. of Werdegar, J.), citations omitted.) Thus, it did not consider whether the residency restriction constitutes increased punishment for an offense when a trial court imposes discretionary sex offender registration as part of the sentence on that offense.
We leave the substance of the sex offender registration scheme untouched. Courts may impose discretionary sex offender registration; registered sex offenders may be subject to the residency restriction. We hold only that imposing the residency restriction through discretionary sex offender registration as part of the sentencing on the underlying offense increases the penalty for that offense beyond the statutory maximum. Accordingly, the facts supporting the imposition of the registration requirement must be found true by a jury beyond a reasonable doubt. That was not done here, so we modify the judgment by striking the sex offender registration requirement, and affirm.
 FACTS
The Incident
L.C. met defendant in June 2003, while she was visiting her grandmother at an Anaheim apartment complex. Defendant was a friend of a boy named B.J., who lived at the apartment complex and whom L.C. had met earlier. L.C.'s grandmother and aunt were sitting down by the pool one night while L.C. hung out with defendant, B.J., and her older brother. L.C. told defendant she was 12 years old. They talked for about 10 minutes, then L.C. went back inside her grandmother's apartment. Later that night, L.C. went to the laundry room. She ran into B.J. and defendant on her way back. Defendant walked up behind her and, when she turned around, he gave her "basically just like a peck" of a kiss. L.C. went back to her grandmother's apartment.
Either the next day or a few days later, L.C. was getting ready to leave her grandmother's apartment and return home to northern California. That afternoon, she was in the apartment building's carport watching her younger cousin ride his scooter. Defendant walked up to her.
Moments later, L.C.'s grandmother went out to check on L.C. She saw defendant reaching out for L.C. and trying to kiss her while she was backing away. His hands touched her somewhere on her upper body. Her grandmother called out to them. Defendant pushed L.C. away and ran off. L.C. went into her grandmother's apartment. The grandmother later told a defense investigator L.C. had asked her, "Please don't tell my mother."
Weeks later, back home in northern California, L.C. told her father defendant had sexually assaulted her. Her father called the local county *Page 1096 
sheriff's office. A deputy sheriff interviewed L.C. She told him she was standing at the carport when defendant grabbed her arms, pushed her against a pole, leaned against her, and grabbed her buttocks and breasts. They slid off the pole, and defendant forced her backwards against a wall. He pulled down his shorts, "unbuckled" her shorts, and raped her for five minutes. L.C. told the deputy her grandmother and brother came to the carport; she explained the two of them could only see L.C.'s and defendant's heads because they were hidden behind a car. She did not tell the deputy defendant had kissed her before. She did not tell the deputy defendant kissed her on her neck in the carport.
An Orange County Sheriff's Office investigator interviewed L.C. the next week. L.C. told the investigator she had kissed defendant the day before the incident at the carport. She told him defendant walked up to her at the carport and immediately grabbed her, without talking to her first. Defendant pinned her against a pole, then pushed her against a wall. They were partly hidden behind a car. She mumbled when the investigator asked to clarify details about the sexual assault. The investigator spoke to L.C. again in June 2005 and September 2005. In one of these interviews, L.C. claimed defendant grabbed her and kissed her on the stairs to the laundry room the day before the carport incident. In the September 2005 interview, L.C. did not mention defendant pushing her against a pole in the carport. The grandmother told the investigator at a June 2005 interview she saw defendant hugging and kissing L.C.
In October 2005, the Orange County District Attorney charged defendant by information with one count of committing a lewd act upon a child under 14. (Pen. Code, § 288, subd. (a).)[1] The district attorney later amended the information to include a count of unlawful sexual intercourse (§ 261.5, subd. (c)), but dismissed that count during jury selection.
The Trial
L.C. testified at the January 2007 trial. She stated defendant had kissed her once before the carport incident, a detail she left out from her first police interview. She testified defendant walked up to her at the carport, and they "were just talking about stuff like what he was doing and — for the past couple days." She later testified her two brothers were with her when defendant approached her at the carport, but they left. Defendant started kissing her neck and tried to kiss her on the mouth — he did not grab her initially — but she moved off of the pole against which she had been leaning and backed away from him. Defendant pursued her into a corner. He put his *Page 1097 
hand down her pants and grabbed her buttocks, rubbed her between her legs, "had both of his hands on [her] wrists where [she] couldn't move," put a hand up her shirt and bra, pulled his shorts down, and unzipped her "skort" (shorts that look like a skirt) and pulled one of its legs to the side. He inserted his penis into her vagina "for about maybe two minutes." Her grandmother walked up and yelled at defendant. L.C. initially testified defendant pulled up his shorts and fled, but later testified he had already pulled up his shorts before her grandmother arrived. Her grandmother asked her, "What were you doing? Why was he standing that close to you?"
L.C.'s grandmother also testified. She stated she went out to the carport to check on L.C. and her little brothers because she had seen the boys running around and wanted to know exactly where they were. She did not remember either boy coming to get her. The grandmother recanted her statement to the police about seeing defendant hugging and kissing L.C. Instead, she testified defendant and L.C. were "struggling," which she clarified as defendant reaching towards L.C. and touching her somewhere on the upper body. The grandmother could see defendant still had his shorts up; she could not see his underwear or buttocks. L.C.'s clothing did not seem out of order, and her grandmother did not recall L.C. having to rearrange it. L.C. seemed scared to her grandmother, but was not crying. The grandmother denied L.C. had asked her, "Please don't tell my mother."
L.C.'s brothers also testified. One testified he saw L.C. standing with her back to the post, while defendant had his shorts down around his knees. He could see defendant's underwear. The other brother testified he saw L.C. standing with her back to the wall, while defendant had his shorts and his underwear down around his knees. He could see defendant's bare buttocks. Upon seeing this, the brother hopped off his skateboard and walked — not ran — back to the apartment to get the grandmother. He told her, "there's this guy out there on [L.C.] and she keeps telling him no." The brother testified the grandmother "ran out there" to get L.C. As L.C. walked back to the apartment after defendant ran off, she was crying.
The defense closing argument focused on witness credibility. Defense counsel stated, "I told you in my opening, credibility is the issue here. . . . It all boils down to the witnesses and whether or not you believe them." Defense counsel walked the jury through L.C.'s and her grandmother's statements to the police and the trial testimony of L.C., her grandmother, and the brothers, pointing out discrepancies among the accounts. She stated, "[t]hey're not little inconsistencies. . . . These are big inconsistencies that matter."
Defense counsel urged the jury to consider finding defendant guilty of the lesser included offense of simple assault. (§ 240.) She argued, "There's also *Page 1098 
another lesser included offense that the district attorney did not tell you about, which will be in your [jury instruction] packet. It's simple misdemeanor battery [sic]. [¶] If you were to believe, say, grandma's testimony that she gave in court, if you believe grandma's testimony that [defendant] was reaching for [L.C.] or that in any way he touched her, that would be a battery [sic], if there's any touching."[2]
After a couple hours of deliberation, the jury found defendant guilty only of assault. It acquitted him of committing a lewd act on a minor. The court released defendant on his own recognizance until sentencing. It later sentenced defendant to serve six months in the county jail, with 180 days' credit for time served.
Although the jury found defendant not guilty of any sexual offense, the court ordered defendant to register as a sex offender. (Former § 290, subd. (a)(2)(E); see § 290.006.) It noted, "We simply don't know what the jury — why the jury acquitted the defendant. It's certainly not obvious that they disbelieved the witnesses." It considered, but rejected as unreliable, a psychologist's report stating defendant is not a pedophile or sexually violent predator and "has not manifested any unusual sexual deviation. . . ."
The court found "the evidence established beyond a reasonable doubt that the defendant sexually assaulted the victim." It noted L.C.'s "truthful and sincere" testimony that defendant "grabbed her, kissed her, fondled her breasts, buttocks and the area between her legs, dropped his pants and inserted his penis into her vagina." It noted L.C.'s grandmother testified to seeing defendant struggle with L.C., and her brothers testified to seeing defendant with his pants down around his ankles. It found defendant was "even more likely" driven by sexual compulsion because he assaulted L.C. in an open carport, and the assault was "not an isolated incident" because he kissed her once before. It concluded, beyond a reasonable doubt, "the assault in this case was committed as a result of sexual compulsion or for purposes of sexual gratification." In addition, it found registration appropriate because defendant was physically dangerous to the public, at serious risk to reoffend, and not being treated for his sexual compulsion. It stayed registration pending appeal.
 DISCUSSION
Defendant concedes his misdemeanor assault conviction, but challenges the sex offender registration requirement. In his opening brief, he contended sex *Page 1099 
offender registration was unwarranted by "the facts of this case,"[3]
constituted cruel and unusual punishment, and violated his right to a jury trial. In his reply brief, defendant invoked Jessica's Law for the first time. He noted its residency restriction barred registered sex offenders from residing within 2,000 feet of any public or private school, or park where children regularly gather. (§ 3003.5, subd. (b).) He asserted "[t]his harsh change in circumstances calls for a re-examination" of whether sex offender registration constitutes punishment.
At our invitation, the parties filed supplemental briefs on whether defendant was subject to Jessica's Law's residency restriction and, if so, whether it constitutes punishment implicating defendant's right to a jury trial.[4] We affirmed defendant's conviction but reversed the registration requirement. (Mosley I) Should be: requirement. (Mosley I.) We analyzed whether the residency restriction constitutes punishment using the factors set forth in Kennedy v. Mendoza-Martinez (1963)372 U.S. 144 [9 L.Ed.2d 644, 83 S.Ct. 554] (Mendoza-Martinez), and determined "Jessica's Law's residency restriction has an overwhelming punitive effect." "Because the residency restriction is punitive," we held, "its imposition by the court increases the penalty for a nonsexual offense beyond the prescribed statutory maximum based upon the jury verdict alone. [Citation.] Thus, the facts required to impose the residency restriction must be found beyond a reasonable doubt by a jury."
The California Supreme Court granted review of Mosley I and deferred action pending its decision in E.J. After deciding E.J., the court directed us to *Page 1100 
vacate Mosley I and reconsider this matter in light of E.J. At our invitation, the parties filed supplemental briefs on the effect, if any, of E.J. on our disposition of this appeal.
Before addressing E.J., we resume our analysis of the residency restriction. We start with Apprendi and the right to a jury trial for any fact (other than a prior conviction) that increases an offense's penalty beyond the statutory maximum.
Apprendi, the Right to a Jury Trial, and Punishment
Starting in the late 1990's, the United States Supreme Court has scrutinized the interplay between the Sixth Amendment's right to a jury trial and laws directing judges to engage in their own factfinding when determining whether to impose "enhanced" punishment at sentencing. (SeeJones v. United States (1999) 526 U.S. 227, 229, 239-241, 243, fn. 6 [143 L.Ed.2d 311, 119 S.Ct. 1215] [construing federal carjacking statute to set forth distinct offenses, not sentencing options; contrary construction would raise dubious constitutional issue of whether judicial factfinding may increase otherwise-maximum punishment]; Almendarez-Torresv. United States (1998) 523 U.S. 224, 243 [140 L.Ed.2d 350, 118 S.Ct. 1219] [court may increase sentence due to defendant's prior conviction; recidivism is "a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence"].)
In Apprendi, the court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (Apprendi, supra, 530 U.S. 466, 490.) It reversed the defendant's convictions for unlawful weapon possession, to which he had pleaded guilty, because the court imposed a sentence enhancement based on its own findings the crimes were motivated by racial bias. (Id. at pp. 469-471.) It observed the rights to due process and trial by jury in criminal matters — "constitutional protections of surpassing importance" (id. at p. 476) — together "indisputably entitle a criminal defendant to `a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt'" (id. at p. 477).
This jury trial entitlement applied equally to elements of a crime and any "enhancements" to the crime used to impose additional punishment. (Apprendi, supra, 530 U.S. at p. 476.) It noted the state "threatened [the defendant] with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race. As a matter of simple justice, it seems obvious that the procedural safeguards designed to protect [the defendant] from unwarranted *Page 1101 
pains should apply equally to the two acts. . . ." (Ibid.) "If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not — at the moment the State is put to proof of those circumstances — be deprived of protections that have, until that point, unquestionably attached." (Id. at p. 484.) "`[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.'" (Id. at p. 490.)
The United States Supreme Court explored the concept of "the prescribed statutory maximum" punishment for a crime in later cases. In Blakely v.Washington (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531] (Blakely), the court held "the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of thefacts reflected in the jury verdict or admitted by the defendant." (Id.
at p. 303.) It continued, "When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts `which the law makes essential to the punishment,' [citation], and the judge exceeds his proper authority." (Id. at p. 304.) Thus, "every defendant has the right to insist that the prosecutor prove to a jury all facts legally essential to the punishment." (Id. at p. 313.)
In United States v. Booker (2005) 543 U.S. 220 [160 L.Ed.2d 621,125 S.Ct. 738] (Booker), the court held the federal sentencing guidelines violated the right to a jury trial by allowing the court to impose sentence enhancements based on its own factfinding, and severed the guideline provisions that made them mandatory. (Id. at pp. 226-227.) It rejected the contention the sentencing guidelines, promulgated by a commission, set no "statutory" maximum punishments at all. (Id. at pp. 237-238.) "The simple answer, of course, is that we were only considering a statute in [Apprendi]. It was therefore appropriate to state the rule in that case in terms of a `statutory maximum'. . . ." (Id. at p. 238.) The court emphasized, "More important than the language used in our holding in Apprendi are the principles we sought to vindicate" (id. at p. 238), such as avoiding "`arbitrary punishments upon arbitrary convictions' without the benefit of a jury . . ." (id. at pp. 238-239).
And in Cunningham v. California (2007) 549 U.S. 270 [166 L.Ed.2d 856,127 S.Ct. 856], the Supreme Court held California's then operative determinate sentencing law (DSL)[5] violated the right to trial by jury by "allow[ing] a judge to impose a sentence above the statutory maximum based on a fact, *Page 1102 
other than a prior conviction, not found by a jury or admitted by the defendant." (549 U.S. at p. 275.) The midterm of a DSL sentencing triad was "the relevant statutory maximum" punishment based upon facts essential to a guilty verdict or plea; imposing an upper term based on aggravating circumstances "found by the judge, not the jury . . . violates Apprendi's brightline rule: Except for a prior conviction, `any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" (Id. at pp. 288-289, citation omitted.)
The United States Supreme Court has not definitively construed the word "penalty" as used in Apprendi and its progeny. Apprendi itself considered a sentence enhancement requiring a longer prison term for persons who committed their offenses while motivated by racial bias. Longer prison terms based upon court-found facts were also at issue in Blakely, Booker, and Cunningham. But these cases did not expressly limit the right to a jury trial only to facts supporting longer prison terms. Apprendi used the broader word "penalty" in its famous phrase. (Apprendi, supra,530 U.S. at p. 490.) At other points, it discussed the "certain pains" that attach to the underlying offense and the "additional pains" that the court may impose at sentencing. (Id. at p. 476.) It later referred to the "punishment beyond that provided by statute" that "heighten[s]" "both the loss of liberty and the stigma attaching to the offense." (Id. at p. 484.) And in Booker, the court insisted "the principles we sought to vindicate" (Booker, supra, 543 U.S. at p. 238) in Apprendi, such as avoiding "`arbitrary punishments upon arbitrary convictions' without the benefit of a jury" (id. at pp. 238-239), are "[m]ore important than the language used in our holding in Apprendi . . ." (id. at p. 238).
But in ex post facto cases, the courts routinely determine what constitutes punishment using the "intent/effect test." When the California Supreme Court held sex offender registration (without the residency restriction) does not constitute punishment for ex post facto analysis, it relied upon two "important" determinants: (1) "whether the Legislature intended the provision to constitute punishment," and (2) "whether the provision is so punitive in nature or effect that it must be found to constitute punishment despite the Legislature's contrary intent." (People v. Castellanos (1999) 21 Cal.4th 785, 795 [88 Cal.Rptr.2d 346, 982 P.2d 211] (Castellanos).) And when the United States Supreme Court held Alaska's sex offender registration law (without a residency restriction) did not constitute punishment under the federal Constitution's ex post facto clause, it also applied the "intent/effect" test. (Smith v. Doe (2003) 538 U.S. 84, 97 [155 L.Ed.2d 164,123 S.Ct. 1140] (Smith).) "If the intention of the legislature was to impose punishment, that ends the inquiry." (Id. at p. 92.) But if the legislature intended to enact "a regulatory scheme that is civil and nonpunitive," then the court must determine whether the statutory scheme is "`"so punitive either in purpose or *Page 1103 
effect as to negate [the State's] intention" to deem it "civil."'" (Ibid.) "Because we `ordinarily defer to the legislature's stated intent,' [citation] `"only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty. . . .'" (Ibid.)
And courts generally determine punitive effect by analyzing the factors set forth in Mendoza-Martinez.[6] The Castellanos court noted the prevalence of the "multifactor test articulated in" Mendoza-Martinez.(Castellanos, supra, 21 Cal.4th at p. 795, fn. 5.) In her separate opinion, Justice Kennard stressed "the Mendoza-Martinez factors are a central part of the second prong of the intent/effect test, and criticized the majority for its truncated analysis of those factors. (Id. at p. 802 (conc. dis. opn. of Kennard, J.).) The Smith court stated: "In analyzing the effects of the Act we refer to the seven factors noted in [Mendoza-Martinez], as a useful framework. These factors, which migrated into our ex post facto case law from double jeopardy jurisprudence, have their earlier origins in cases under the Sixth
and Eighth Amendments, as well as the Bill of Attainder and the Ex PostFacto Clauses. [Citations]. Because the Mendoza-Martinez factors are designed to apply in various constitutional contexts, we have said they are `neither exhaustive nor dispositive,' [citations], but are `useful guideposts,' [citation]. The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose."[7] (Smith, supra,538 U.S. at p. 97.)
One of our sister courts applied the Mendoza-Martinez factors to hold the public notification requirement in California's sex offender registration laws (§ 290.46) did not constitute an increased penalty triggering the right to a jury trial. (People v. Presley (2007)156 Cal.App.4th 1027, 1033-1035 [67 Cal.Rptr.3d 826].) This approach — using the Mendoza-Martinez factors to *Page 1104 
determine what constitutes an Apprendi-incrcascd penalty — is sound. And at oral argument in our case, the Attorney General conceded the usefulness of the Mendoza-Martinez factors in this case.
Thus, we will use the intent/effect test to decide whether the residency restriction constitutes an increased penalty beyond the statutory maximum under Apprendi. And we will apply the Mendoza-Martinez
factors to determine whether the residency restriction has a punitive effect. To do this, we turn our attention to the sex offender registration scheme and the impact of Jessica's Law.
Sex Offender Registration and Jessica's Law Residency Restriction
California law has provided for sex offender registration for more than 60 years. (See Wright v. Superior Court (1997) 15 Cal.4th 521, 526 [63 Cal.Rptr.2d 322, 936 P.2d 101].) The Legislature enacted section 290 in 1947, requiring persons convicted of certain sexual offenses to provide a written statement, fingerprints, and a photograph to county law enforcement, and to inform law enforcement of any change of address. (Stats. 1947, ch. 1124, § 1, pp. 2562-2563.) Sex offender registration proceeded uneventfully over the following decades, with little tinkering with the registration rules. The Wright court could correctly observe section 290, even as late as 1994, was still "part of a comprehensive scheme enacted in 1947 [that] assumed substantially its present form in 1950." (Wright, at p. 526.)
In 1994, however, the Legislature extended the scope of sex offender registration. Until then, former section 290 provided for "mandatory registration" of persons convicted of specified sexual offenses — those persons, and only those persons, had to register. (Hofsheier, supra,37 Cal.4th at pp. 1196-1197; former § 290, subd. (a)(1)(A).)[8] The 1994 amendment allowed for "discretionary registration." (Hofsheier, at pp. 1196-1198.) It granted the court discretion to order sex offender registration for persons convicted of "any offense . . . if the court finds . . . the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification." (Stats. 1994, ch. 867, § 2.7, pp. 4389-4390; former § 290, subd. (a)(2)(E).)[9] Thus, "discretionary registration does not depend on the specific crime of which a defendant was convicted. Instead, the trial court *Page 1105 
may require a defendant to register . . . even if the defendant was not convicted of a sexual offense."[10] (Hofsheier, at pp. 1197-1198.)
In 1999, the California Supreme Court held in Castellanos that sex offender registration does not violate the federal and state constitutional bars against ex post facto laws because it does not constitute punishment. (Castellanos, supra, 21 Cal.4th at p. 796.) It noted, "the method of analyzing what constitutes punishment varies depending upon the context in which the question arises. But two factors appear important in each case: whether the Legislature intended the provision to constitute punishment and, if not, whether the provision is so punitive in nature or effect that it must be found to constitute punishment despite the Legislature's contrary intent." (Id. at p. 795.)
As for the first factor — legislative intent — the Castellanos court held, "[t]he sex offender registration requirement serves an important and proper remedial purpose, and it does not appear that the Legislature intended the registration requirement to constitute punishment." (Castellanos, supra, 21 Cal.4th at p. 796.) It noted, "[T]he sex offender registration requirement `is intended to promote the "`state interest in controlling crime and preventing recidivism in sex offenders.'" [Citation.] As [the Supreme Court] consistently has reiterated: "The purpose of section 290 is to assure that persons convicted of the crimes enumerated therein shall be readily available for police surveillance at all times because the Legislature deemed them likely to commit similar offenses in the future. [Citation.]" [Citations.] . . . [¶] . . . The statute is thus regulatory in nature, intended to accomplish the government's objective by mandating certain affirmative acts.'" (Ibid.)
As for the second factor — punitive effect — the Castellanos court held, "Nor is the sex offender registration requirement so punitive in fact that it must be regarded as punishment, despite the Legislature's contrary intent. Although registration imposes a substantial burden on the convicted offender, this burden is no more onerous than necessary to achieve the purpose of the statute." (Castellanos, supra,21 Cal.4th at p. 796.) The registration burden at issue was substantially similar to the original 1947 registration law: the "lifelong" requirement to "furnish[] to the chief of police of the city in which the offender resides (or to the sheriff of the county, if the offender resides in an unincorporated area) a written statement, fingerprints, and a photograph, which are forwarded to the California Department of Justice." (Id. at p. 790.) *Page 1106 
The effect of sex offender registration changed when the voters approved Jessica's Law in 2006. Section 1 provides its short title, "The Sexual Predator Punishment and Control Act: Jessica's Law." (Voter Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 1, p. 127.) Its official title on the ballot, prepared by the Attorney General, is "Sexual Offenders. Sexually Violent Predators. Punishment, Residence Restrictions and Monitoring. Initiative Statute." (Id., official title and summary of Prop. 83, p. 42.)
Jessica's Law made dozens of changes to the laws regarding sex offender registration and sexually violent predators (SVP's). As the Legislative Analyst noted in the ballot analysis, Jessica's Law "Increase[s] Penalties for Sex Offenses" by "broaden[ing] the definition of certain sex offenses," "provid[ing] for longer penalties for specified sex offenses," "prohibit[ing] probation in lieu of prison for some sex offenses," "eliminat[ing] early release credits for some inmates convicted of certain sex offenses," "extend[ing] parole for specified sex offenders," "generally mak[ing] more sex offenders eligible for an SVP commitment," and "chang[ing] the standard for release of SVPs from a state mental hospital." (Voter Information Guide, Gen. Elec., supra, analysis of Prop. 83 by the Legislative Analyst, pp. 43-44, boldface 
italics omitted.)
Jessica's Law imposed a new burden on registered sex offenders by amending section 3003.5 to add the residency restriction. (Voter Information Guide, Gen. Elec., supra, text of Prop. 83, § 21, p. 135.) The new subdivision provided, "Notwithstanding any other provision of law, it is unlawful for any person for whom registration is required pursuant to Section 290 to reside within 2000 feet of any public or private school, or park where children regularly gather." (Ibid., italics omitted; § 3003.5, subd. (b).) It also added a subdivision providing, "Nothing in this section shall prohibit municipal jurisdictions from enacting local ordinances that further restrict the residency of any person for whom registration is required pursuant to Section 290." (Voter Information Guide, Gen. Elec., supra, text of Prop. 83, § 21, p. 135, italics omitted; § 3003.5, subd. (c).) Jessica's Law imposed other increased restrictions, including requiring certain sex offenders to be monitored by global positioning system at their own expense for life. (Voter Information Guide, Gen. Elec., supra, text of Prop. 83, § 22, p. 135; § 3004, subds. (b), (c).)
Jessica's Law's Residency Restriction Constitutes a Penalty Due to ItsPunitive Effect
We now reach this case's basic issue: does the residency restriction imposed by Jessica's Law constitute punishment? If so, imposing the residency restriction would increase the penalty for offenses beyond the statutory *Page 1107 
maximum when imposed at the court's discretion.[11] And so Apprendi
would require any facts supporting the court's exercise of discretion to be found by a jury beyond a reasonable doubt.
Punitive Intent. We start by assessing punitive intent, the first prong of the intent/effect test. The most obvious starting point is Proposition 83's intent clause. (See Smith, supra, 538 U.S. at p. 93 [express statement in statutory text may reveal intent].) It refers in places to punishing sex offenders, though not in connection with the residency restriction. Instead, it and the ballot pamphlet state the residency restriction is intended to control registered sex offenders and create predator free zones around our children's schools and parks.
Nonetheless, other factors indicate the voters intended the residency restriction to be punitive. Proposition 83 provided for codification of the residency restriction in the Penal Code, and renders residing near schools or parks "unlawful" for registered sex offenders. (See Smith,supra, 538 U.S. at p. 94 ["manner of its codification or the enforcement procedures" may reveal intent].) The residency restriction's blanket treatment of all registered sex offenders, lack of a grandfather clause or grace period, and authorization of local ordinances imposing stricter restrictions further suggest a punitive intent.
This issue is close, pitting the express statement of regulatory intent against several provisions implying a punitive intent. We will defer to the express statement, concluding by a narrow margin that the residency restriction lacks a punitive intent.[12]
Punitive Effect. We turn to assessing punitive effect, the second prong of the intent/effect test. As the Smith court did, we will focus on the five most salient Mendoza-Martinez factors. (Smith, supra,538 U.S. at p. 97; accord, Castellanos, supra, 21 Cal.4th at pp. 803-805
(conc. dis. opn. of Kennard, J.) [applying factors].) *Page 1108 
Affirmative Disability or Restraint. The residency restriction affirmatively restrains the rights of registered sex offenders to choose where to live and make decisions concerning their families. "We find it difficult to imagine that being prohibited from residing within certain areas does not qualify as an affirmative disability or restraint." (Commonwealth v. Baker (Ky. 2009) 295 S.W.3d 437, 445 (Baker).) Registered sex offenders cannot stay in their own home if it happens to fall within an exclusion zone, no matter how long they have lived there — there is no grandfather clause, grace period, or exceptions. If they have families of their own, they face the unpleasant choice between living away from their families or uprooting their families and relocating. And relocation may be impossible or impracticable given the sweeping extent of the zone of exclusion. They cannot move to housing near a school or park, no exceptions. This restricts more than their housing choice. It "`impact[s] where an offender's children attend school, access to public transportation for employment purposes, access to employment opportunities, access to drug and alcohol rehabilitation programs and even access to medical care and residential nursing home facilities for the aging offender.'" (Ibid.; accord, Mikaloff v. Walsh
(N.D. Ohio, Sept. 4, 2007, No. 5:06-CV-96) 2007 WL 2572268 (Mikaloff).)
The residency restriction also subjects registered sex offenders to the constant threat of ouster if a school or park opens nearby. (Mann v.Georgia Dept. of Corrections (2007) 282 Ga. 754 [653 S.E.2d 740, 756] (Mann).) The residency restriction "looms over every location appellant chooses to call home" (id., 653 S.E.2d at p. 759), as "there is no place in [the state] where a registered sex offender can live without being continually at risk of being ejected." (Id. at p. 755; accord, State v.Pollard (Ind. 2009) 908 N.E.2d 1145, 1150 (Pollard) [restriction precludes registrants from "find[ing] a permanent home in that there are no guarantees a school or [other facility] will not open within 1,000 feet of any given location"].) Community groups may deliberately set up private schools to force offenders to move away. (Mann, supra,653 S.E.2d at p. 756.) "[S]ubjecting a sex offender to constant ouster from his or her home seems a significant deprivation of liberty and property interests. It sentences them to a life of transience, forcing them to become nomads." (Mikaloff, supra, 2007 WL 2572268 at p. *10.) This factor tips heavily toward punitive effect.
History and Tradition as Punishment. The residency restriction is a novel measure. But it is akin to banishment, a traditional form of punishment. (Smith, supra, 538 U.S. at p. 98.) Like banishment, the residency restriction permanently excludes registered sex offenders from certain neighborhoods and hinders their acceptance into new ones. (Ibid., [discussing banishment].) To be sure, the residency restriction is unlike banishment in that offenders are not expressly excluded from a specified political subdivision. But the common thread of exclusion from a given area is the same. As the Supreme Court *Page 1109 
of Kentucky recently noted, the residency restriction is "decidedly similar to banishment" because "it does prevent the registrant from residing in large areas of the community. It also expels registrants from their own homes, even if their residency predated the statute or the arrival of the school . . . or playground." (Baker, supra,295 S.W.3d at p. 444.)
And in light of the large number of schools and parks in our communities and the size of the 2,000-foot exclusion zone, the residency restriction may well have the effect of banishing registered sex offenders from California's densely populated cities. One commentator reports that Jessica's Law "effectively banned registered sex offenders from residing in half of the Sacramento urban area, nearly seventy percent of the San Francisco Bay area, and about seventy-five percent of the Los Angeles metro area." (Barvir, When Hysteria and Good Intentions Collide: Constitutional Considerations of California's Sexual Predator Punishment and Control Act (2008) 29 Whittier L. Rev. 679, 687; see Doev. Miller (8th Cir. 2005) 405 F.3d 700, 724 (conc. dis. opn. of Melloy, J.) (Miller) [Iowa residency restriction "`cover[s] virtually the entire city area'" of Des Moines and Iowa City and "`[i]n smaller towns that have a school or childcare facility, the entire town is often engulfed by the excluded area'."].)
The residency restriction is also akin to the traditional punishments of property deprivation and probation or parole. (Nixon v. Administratorof General Services (1977) 433 U.S. 425, 474 [53 L.Ed.2d 867,97 S.Ct. 2777] ["`pains and penalties' historically" constituting punishment for bill of attainder analysis "commonly included . . . imprisonment, banishment, and the punitive confiscation of property by the sovereign" (fns. omitted)]; Morrissey v. Brewer (1972) 408 U.S. 471,477 [33 L.Ed.2d 484, 92 S.Ct. 2593] ["parole is an established variation on imprisonment . . ."].) It threatens to deprive registered sex offenders of the full use and enjoyment of any real property they own near schools and parks. (Mann, supra, 653 S.E.2d at p. 760 [residency restriction is an uncompensated regulatory taking]; Pollard, supra,908 N.E.2d at p. 1150 [residency restriction "does not affect ownership of property, [but] it does affect one's freedom to live on one's own property"].) And while parole and probation empower the state to approve a released convict's residence on a case-by-case basis for a limited time, Jessica's Law broadly disapproves all registered sex offenders from residing near schools or parks for the rest of their lives. (See Pollard, at p. 1151 ["restrictions on living in certain areas is not an uncommon condition of probation or parole"]; Mikaloff, supra, 2007 WL 2572268 at pp. *9-*10 [residency restriction is "analogous to" probation and parole, but even "more onerous"].) The residency restriction — the exclusion of registered sex offenders from residing near schools and parks — is sufficiently close to banishment, property deprivation, and a probation condition to be deemed traditional punishment. This factor weighs in favor of punitive effect. *Page 1110 
Traditional Aims of Punishment. The traditional aims of punishment are deterrence and retribution. (Mendoza-Martinez, supra, 372 U.S. at p. 168;Smith, supra, 538 U.S. at p. 102.) The residency restriction is concededly designed to deter sex offenses. (Cf. Pollard, supra,908 N.E.2d at p. 1152 [residency restriction "is an even more direct deterrent to sex offenders than the . . . registration and notification regime"].) And the residency restriction arguably seeks retribution against registered sex offenders, as the same factors that imply a punitive intent also suggest a desire to seek "`vengeance for its own sake.'" (Id. at p. 1152, fn. 7.) The residency restriction "makes no individualized determination of the dangerousness of a particular registrant. Even those registrants whose victims were adults are prohibited from living near an area where children gather. When a restriction is imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones." (Baker,supra, 295 S.W.3d at p. 444.) This factor tips toward punitive effect.
Rational Connection to Nonpunitive Purpose. The residency restriction is rationally connected to the nonpunitive purpose of protecting children in and around schools and parks. This factor weighs against punitive effect. (But see Baker, supra, 295 S.W.3d at pp. 445-446 [residency restriction "is connected to public safety. However, the statute's inherent flaws prevent that connection from being `rational.'"].)
Excessiveness with Respect to Nonpunitive Purpose. The residency restriction is excessively broad with regard to the protection of children by schools and parks. It affects all registered sex offenders equally, even those whose offenses did not involve children. Its 2,000-foot geographic scope creates expansive exclusion zones around the tens of thousands of schools and parks in California. It is poised to exclude registered sex offenders from neighborhoods, cities, or even entire metropolitan areas, crowding offenders into the same limited number of school-less, park-less areas. But it does not bar registered sex offenders from living near children — just schools and parks. Thus, whatever the danger posed by registered sex offenders, the residency restriction shifts that danger from children living in desirable neighborhoods near schools and parks to children who live in less privileged areas. (See Mikaloff, supra, 2007 WL2572268 at p. *11.) The residency restriction also allows registered sex offenders to loiter around schools and parks during the day while children are out, as long as they go somewhere else at night, when the children have gone home. (Ibid.)
Barring all registered sex offenders from living near any schools and parks — without considering whether their offenses involved children, whether *Page 1111 
the exclusion zone provides adequate alternate housing for them, or whether their exclusion from living near schools and parks provides substantial protection to our children — is excessive to the nonpunitive purpose of child protection. (See Baker, supra, 295 S.W.3d at p. 446 ["the `magnitude of the restraint' involved in residency restrictions is sufficient for a lack of individual assessment to render the statute punitive"]; Pollard, supra, 908 N.E.2d at p. 1153 ["Restricting the residence of offenders based on conduct that may have nothing to do with crimes against children, and without considering whether a particular offender is a danger to the general public, [the residency restriction] exceeds its non-punitive purposes."].) This factor weighs in favor of punitive effect.
The Attorney General relies on unpersuasive cases, which held the punitive effect of other states' residency restrictions did not outweigh their nonpunitive intent, and so did not violate the ban on ex post facto laws. (Miller, supra, 405 F.3d at pp. 719-723; Weems v. Little RockPolice Dept. (8th Cir. 2006) 453 F.3d 1010; State v. Seering (Iowa 2005)701 N.W.2d 655 (Seering); Lee v. State (Ala.Crim.App. 2004) 895 So.2d 1038,1043-1044 (Lee).)
We disagree with these cases. In considering the first factor, traditional punishment, the cases miss the similarity between the residency restriction and property deprivation, probation, and parole, limiting their analysis to banishment. (Miller, supra, 405 F.3d at p. 719;Seering, supra, 701 N.W.2d at p. 667; Lee, supra, 895 So.2d at p. 1043.) They then construe banishment too narrowly, demanding express, complete exclusion from a political subdivision. (Miller, at p. 719; Seering, at pp. 667-668.) They do not consider whether the residency restrictions would have that ultimate effect — a glaring omission from an analysis of "punitive effect." The cases also unreasonably dismiss the second factor, the traditional aims of punishment. They discount the residency restriction's deterrent and retributive effects with the banal observation that even nonpunitive statutes may have these effects. (Miller, at p. 720; Seering, at p. 669; Lee, at p. 1043.) This reasoning eliminates the "traditional aims" factor from the equation.
More basically, these cases refuse to weigh the variousMendoza-Martinez factors and, instead, wrongly collapse them into one: a rational relation to nonpunitive purpose. Miller, for example, rejects the "potentially retributive" effect of the residency restriction because it "is consistent with the legislature's regulatory objective of protecting the health and safety of children." (Miller, supra,405 F.3d at p. 720.) It also passes over the conceded affirmative disability by stating it "ultimately points us to the importance of the next inquiry: whether the law is rationally connected to a nonpunitive purpose, and whether it is excessive in relation to that purpose." (Id. at p. 721.) Similarly, Seering discounts the deterrent effect as "secondary and *Page 1112 
largely `consistent with the regulatory objective'" and dismisses "the disabling nature of the [restriction]" as "not absolute" given "the objectives of the residency restriction . . . ." (Seering, supra,701 N.W.2d at p. 668.)
We once again conclude Jessica's Law's residency restriction has an overwhelmingly punitive effect. It affirmatively restrains the right to choose a home and limits the right to live with one's family. It effectuates traditional banishment under a different name, interferes with the right to use and enjoy real property near schools and parks, and subjects housing choices to government approval like parole or probation. It deters sex offenses and comes close to imposing retribution on offenders. While it has a nonpunitive purpose of protecting children, it is excessive with regard to that purpose. It would oust a person never convicted of any offense against a child from his family home near a school or park, forcing him to leave his family or consigning the family to potential transience. Relocation would be limited to the few outskirts of town lacking a school or park. Yet the residency restriction would allow a convicted child molester to stroll past the school and eat ice cream in the park — as long as he or she retreats at night to housing far from a school or park. And there, the child molester may live undisturbed next door to small children. Building exclusion zones around all schools and parks for all registered sex offenders is excessively punitive, which clearly outweighs the proclaimed lack of regulatory, nonpunitive intent. (See Smith, supra, 538 U.S. at p. 92 ["`"clearest proof"'" of punitive effect outweighs lack of punitive intent].)
We are not the first jurists to recognize the overwhelming punitive effect of a residency restriction. The Supreme Courts of Kentucky and Indiana have held their state's residency restrictions constitute ex post facto laws because of their punitive effects. (See Baker, supra,295 S.W.3d at p. 447; Pollard, supra, 908 N.E.2d at p. 1154.) Other jurists have reached similar conclusions. (Mikaloff, supra, 2007 WL 2572268
at pp. *9-*10 [residency restriction is punitive]; People v. Leroy (2005)357 Ill.App.3d 530 [293 Ill.Dec. 459, 828 N.E.2d 769, 793] (dis. opn. of Kuehn, J.) [same]; Miller, supra, 405 F.3d at p. 726 (conc. dis. opn. of Melloy, J.) [same].)
Because the residency restriction is punitive, its imposition by the court increased the penalty for defendant's misdemeanor offense beyond the statutory maximum based upon the jury verdict alone. (Apprendi,supra, 530 U.S. at p. 490.) Thus, the facts required to impose the residency restriction must be found beyond a reasonable doubt by a jury. (Ibid.) That was not done here.
E.J. Does Not Alter This Conclusion
As directed, we consider the effect of E.J. on this analysis. E.J. has no effect because the high court was addressing whether the residency restriction *Page 1113 
was being applied retroactively to registered sex offenders released on parole after the passage of Jessica's Law. The court did not consider the general issue of whether the residency restriction constitutes punishment. Nor did it consider the specific issue of whether the residency restriction increases the penalty for an offense (not triggering mandatory sex offender registration) beyond the statutory maximum.
In E.J., the court considered a habeas petition "filed by four registered sex offender parolees" (E.J., supra, 47 Cal.4th at p. 1264) upon whom "the California Department of Corrections and Rehabilitation . . . sought to enforce section 3003.5(b) as a statutory parole condition . . ." (E.J., at p. 1263). "In each case, the petitioner was convicted of a sex offense or offenses, for which lifetime registration was required pursuant to section 290, well before the passage of Proposition 83. In each case, the petitioner was released from custody on his current parole after November 8, 2006, the effective date of the new law." (E.J., at p. 1264.)
The E.J. petitioners "contend[ed] that enforcement of section 3003.5(b)'s residency restrictions as to them constitutes an impermissible retroactive application of the statute . . . because it attaches new legal consequences to their convictions of registrable sex offenses suffered prior to the passage of Proposition 83. In a closely related argument, petitioners contend[ed] that such retroactive enforcement of section 3003.5(b) further violates the ex post facto clauses of the United States and California Constitutions insofar as it "`makes more burdensome the punishment for a crime, after its commission."'" (E.J., supra, 47 Cal.4th at p. 1264, citation omitted.) The petitioners also challenged the residency restriction as an "unreasonable, vague, and overbroad parole condition." (Ibid.)
The Supreme Court rejected the retroactivity claim, holding "the new residency restrictions here in issue are being prospectively applied to petitioners," each of whom "was released from custody on his current parole and took up residency in noncompliant housing after
section 3003.5(b)'s effective date." (E.J., supra, 47 Cal.4th at p. 1272.) It noted, "[T]he critical question for determining retroactivity usually is whether the last act or event necessary to trigger application of the statute occurred before or after the statute's effective date." (Id. at p. 1273.) And it held, "For purposes of retroactivity analysis, the pivotal `last act or event' [citation] that must occur before the mandatory residency restrictions come into play is the registered sex offender's securing of a residence upon his release from custody onparole. If that `last act or event' occurred subsequent to the effective date of section 3003.5(b), a conclusion that it was a violation of the registrant's parole does not constitute a `retroactive' application of the statute." (E.J., supra, 47 Cal.4th at p. 1274, italics added.) *Page 1114 
The Supreme Court also rejected the E.J. petitioners' ex post facto claim. It noted, "`A retrospective law violates the ex post facto clauses when it "substantially alters the consequences attached to a crime already completed, and therefore changes `the quantum of punishment.'"`" (E.J., supra, 47 Cal.4th at p. 1280.) And it conceded the residency restriction "applies to these petitioners only by virtue of their status as registered sex offenders, a status they achieved upon their convictions of qualifying sex offenses prior to the enactment of Jessica's Law and section 3003.5(b)." (E.J., supra, 47 Cal.4th at p. 1280.) "Nevertheless," the court held, "[T]he new residency restrictions apply to events occurring after their effective date — petitioners' acts of taking up residency in noncompliant housing upon their release from custody on parole after the statute's effective date. (10) It follows that section 3003.5(b) is not an ex post facto law if applied to such conduct occurring after its effective date because it does not additionally punish for the sex offense conviction or convictions that originally gave rise to the parolee's status as a lifetime registrant under section 290." (E.J., supra, 41 Cal.4thatp. 1280.)
E.J. does not compel denial of a jury trial for discretionary sex offender registration.[13] The primary issue there was whether Jessica's Law was being applied retroactively to the petitioners, not whether the residency restriction constituted punishment. Even in E.J.'s ex post facto discussion, the critical question was one of timing: When
did the residency restriction start affecting the petitioners? The court held Jessica's Law was not ex post facto as applied to the petitioners because it was being applied as a condition for their future release on parole — they were still in custody when Jessica's Law was passed. (E.J.,supra, 47 Cal.4th at p. 1280.) When the court stated "section 3003.5(b) is not an ex post facto law if applied to such conduct occurring after its effective date because it does not additionally punish for the sex offense conviction or convictions that originally gave rise to the parolee's status as a lifetime registrant under section 290," the "such conduct" it was referring to was "petitioners' acts of taking up residency in noncompliant housing upon their release from custody onparole after the statute's effective date." (Ibid., italics added.) And so when the court stated "section 3003.5(b) . . . does not additionally punish for the [registrable] sex offense conviction . . ." (id. at p. 1280), it meant that the residency restriction does not retroactively punish the original offense when imposed as a condition of future parole.
In these cases, the residency restriction is just one of any number of conditions *Page 1115 
imposed before a prisoner is paroled. It is not being imposed as part of the underlying offense's sentence.
The narrowness of E.J.'s holding is further shown by the issues it did not reach. The court did not hold the residency restrictions applied prospectively if imposed on all persons who had committed registrable offenses or had registered as sex offenders before Jessica's Law was passed. It did not hold the residency restriction could never constitute an ex post facto law. The court expressly declined to reach whether the residency restriction could be enforced as a misdemeanor, or in any way other than as a parole condition. (E.J., supra, 47 Cal.4th at p. 1271, fn. 5.) And it did not opine whether the petitioners would still be subject to the residency restriction after their parole terms expired. These unanswered questions underscore the limitation of E.J.'s residency restriction analysis to parole conditions.[14]
Justice Werdegar aptly "emphasize[d] the narrowness of . . . the issue before the court" in her concurrence. (E.J., supra, 47 Cal.4th at p. 1285
(conc. opn. of Werdegar, J.).) She noted the court "address[ed] in this case the meaning of section 3003.5(b) only as it relates to a condition of parole, and not whether it is also a misdemeanor crime." (Id. at p. 1285 (conc. opn. of Werdegar, J.).) She also clarified that "now before the court are four parolees who were paroled after passage of Proposition 83. We thus also have no occasion here to address whether the 2,000-foot residency limit might apply to those who completed their paroles before the effective date of Proposition 83 [citation]; to those whose parole period began before, but is scheduled to terminate after, that date [citation]; or even to the thousands of persons subject to sex offender registration who, for whatever reason, are not currently on parole." (Ibid.) Among those thousands of persons left unaddressed by the court was defendant. *Page 1116 
The California Supreme Court later touched on E.J.'s effect on theApprendi issue in People v. Picklesimer (2010) 48 Cal.4th 330 [106 Cal.Rptr.3d 239, 226 P.3d 348] (Picklesimer). In Picklesimer, the defendant had pleaded guilty in 1993 to a sex offense requiring mandatory sex offender registration. (Picklesimer, at p. 336.) He moved to be removed from the sex offender registry in 2006.[15] (Picklesimer, at p. 336.) The court held the defendant could seek relief only through a petition for a writ of mandate, not a "freestanding postjudgment motion. . . ." (Id. at p. 335.) The defendant's motion could not be treated as such a writ petition because the record on appeal was inadequate to show he was entitled to relief. (Id. at p. 341.) Even if the court assumed the defendant was no longer subject to mandatory registration, he failed to show he was legally ineligible for discretionary sex offender registration. (Ibid.)
In reaching that conclusion, the Picklesimer court rejected the defendant's Apprendi claim. He had contended "that the sex offender residency restrictions . . . are punishment, and thus that the facts required to impose those restrictions — the facts supporting continued sex offender status — must now be found beyond a reasonable doubt by a jury pursuant to Apprendi . . . and its progeny. . . ." (Picklesimer,supra, 48 Cal.4th at p. 344, citations omitted.) The court stated: "Picklesimer cannot show a potential Apprendi violation on this basis. If Proposition 83's restrictions do not amount to punishment for his original crimes, there is no Apprendi problem and no right to a jury trial. Conversely, if Proposition 83's restrictions were to be considered punishment for his original offenses (but see In re E.J. [, supra,]47 Cal.4th 1258, 1271-1280 . . .), they could not under the state and federal ex post facto clauses be constitutionally applied to Picklesimer, whose crimes all long predate the approval of Proposition 83. [Citations.] In either event, there is no constitutional bar to having a judge exercise his or her discretion to determine whether Picklesimer should continue to be subject to registration." (Picklesimer, supra, 48 Cal.4th at p. 344.)
The narrowness of E.J. explains the unresolved hypothetical inPicklesimer. What did the court mean when it said: "if the residency restriction is punishment for the original offense . . ."but see" E.J.? The Picklesimer court could not have meant E.J. foreclosed the conclusion that the residency restriction is punishment for the original offense. IfE.J. reached so broadly, then the Picklesimer court would not have had to indulge an "if this/if that" hypothetical supported backhandedly with a "but see" citation to E.J. Instead, *Page 1117 
the court could have made the straightforward statement: "The residency restriction does not punish the original offense. See E.J." Picklesimer
did not state that because it could not state that — E.J. held no such thing. E.J. held only that the residency restriction does not punish the original offense when imposed after sentencing, as a condition of a future parole. This holding may be "somewhat contrary to, or inconsistent with," the hypothetical proposition that the residency restriction isnecessarily punishment for the original offense — justifying the "but see" signal. (Cal. Style Manual (4th ed. 2000) § 1:4, p. 10.) But E.J. isno support for the proposition that the residency restriction is never
punishment for the original offense.
Thus, in E.J. and Picklesimer, the California Supreme Court teaches that whether the residency restriction punishes the original offense depends on how and when it is imposed. In E.J., it held the residency restriction is not punishment for the original offense when imposed as a condition of a future parole. In Picklesimer, it recognized the limited reach of E.J. by phrasing its citation to E.J. to leave unaddressed those situations in which imposing the residency restriction would punish the original offense.
Here, the imposition of the residency restriction punished defendant for his original offense. The court required defendant to register as a sex offender as part of his sentence on the misdemeanor conviction. Sex offender registration itself may be regulatory, but the residency restriction is distinctly punitive. As such, imposition of the residency restriction upon defendant as part of his misdemeanor sentence constituted additional punishment for that offense. And because the court imposed discretionary sex offender registration, not registration mandated by statute, imposition of the residency restriction upon defendant increased the penalty for his misdemeanor offense beyond the statutory maximum. Apprendi thus entitled defendant to a jury finding, made beyond a reasonable doubt, of any fact supporting discretionary sex offender registration and the resulting residency restriction. No such jury findings were made here.
The Attorney General invokes E.J. in an attempt to preserve the imposition of the residency restriction upon defendant, but the effort falls short. The Attorney General contends E.J. stands for the broad proposition that the imposition of the residency restriction is never punishment until it is enforced. But E.J. stands only for a more limited proposition concerning imposition of the residency restriction as a parole condition, as already shown. Moreover, the residency restriction plainly provides "it is unlawful" for any registered sex offender to reside within 2,000 feet of a school or park where children gather. (§ 3003.5, subd. (b).) The burden of complying with the residency restriction — and thus the punitive effect of it — arises upon registration, not at enforcement. *Page 1118 
The Attorney General also invokes Picklesimer in an attempt to preserve imposition of discretionary sex offender registration upon defendant by severing the residency restriction from the registration requirement. The Attorney General notes Picklesimer stated that even if applying the residency restriction to the defendant would be ex post facto, "there is no constitutional bar to having a judge exercise his or her discretion to determine whether Picklesimer should continue to be subject to registration." (Picklesimer, supra, 48 Cal.4th at p. 344.) By this means, the Attorney General seeks to distinguish the residency restriction from the act of registration.
But Picklesimer did not sever one consequence of registration from other consequences. Picklesimer is a case about remedies and forums. Its holding is that Picklesimer must seek relief from sex offender registration by petitioning for a writ of mandate from the trial court. (Picklesimer, supra, 48 Cal.4th at p. 335.) Because Picklesimer erred by instead filing a trial court motion, the Supreme Court affirmed the dismissal of his appeal "without prejudice to Picklesimer's opportunity to file an original petition for writ of mandate in the trial court. . . ." (Id. at p. 346.) And because PickJesimer had chosen the wrong remedy, the Supreme Court had no need at that time to decide whether the residency restriction constituted punishment, or what to do if it did. It left these issues unanswered.
All that the Picklesimer court needed to decide, and did decide, was that the trial court was entitled to make the first decision whether to impose discretionary sex offender registration — and in doing so, whether the residency restriction is punitive. If the trial court found the residency restriction constituted punishment, it presumably would exercise its sound discretion not to require Picklesimer to register, because imposing the residency restriction upon him would violate the ex post facto clauses. But if the trial court found the residency restriction was not punitive, there would be no Apprendi problem with imposing discretionary sex offender registration upon Picklesimer.[16] Thus, thePicklesimer court did not purport to prejudge whether the residency restriction constitutes punishment. It simply left the matter open for the trial court's consideration on a potential future petition *Page 1119 
for a writ of mandate. It did not hold, or even suggest, the Legislature's sex offender registration scheme could be severed.
Thus, in Picklesimer's case, whether or not the residency restriction is punitive would be no barrier to requiring him to seek his remedy by writ of mandate in the trial court. In our case, Picklesimer does not bar the holding that the residency restriction is punitive — and that discretionary sex offender registration entailing the residency restriction cannot be imposed upon defendant on the basis of facts not found beyond a reasonable doubt by a jury.
 DISPOSITION
The judgment is modified by striking the discretionary sex offender registration requirement. We affirm the judgment as modified.
O'Leary, Acting P. J., and Moore, J., concurred.
[1] All further statutory references are to the Penal Code.
[2] Defense counsel referred to battery as the lesser included offense on which the jury would be instructed. The jury was actually instructed on the lesser included offense of simple assault. (§§ 240, 241, subd. (a).)
[3] We reject this claim. The court has discretion to order sex offender registration for "any offense . . . if the court finds at the time of conviction or sentencing that the person committed the offense as a result of sexual compulsion or for purposes of sexual gratification." (Former § 290, subd. (a)(2)(E), italics added.) "[D]iscretionary registration does not depend on the specific crime of which a defendant was convicted. Instead, the trial court may require a defendant to register . . . even if the defendant was not convicted of a sexual offense." (People v. Hofsheier (2006) 37 Cal.4th 1185, 1197-1198 [39 Cal.Rptr.3d 821, 129 P.3d 29] (Hofsheier).) The court expressly found L.C. credible. "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (People v. Maury (2003) 30 Cal.4th 342, 403 [133 Cal.Rptr.2d 561, 68 P.3d 1].) L.C.'s testimony sufficiently supports the findings that defendant assaulted her as a result of sexual compulsion and for purposes of sexual gratification. (Former § 290, subd. (a)(2)(E).) It also supports the court's reasons for imposing registration: defendant was physically dangerous to the public, at serious risk to reoffend, and not being treated for his sexual compulsion. (Ibid.) Thus, had these facts been found by a jury, the court would have acted within its discretion by requiring registration.
[4] We also granted defendant's request and accepted additional briefs from the parties on whether the residency restriction constitutes cruel and unusual punishment. We need not reach this contention.
[5] The California Legislature subsequently amended the DSL. (See § 1170, subd. (b).)
[6] Mendoza-Martinez set forth the punitive effect factors while holding laws divesting certain draft evaders of citizenship constituted punishment. (Mendoza-Martinez, supra, 372 U.S. at pp. 165-167.) It noted, "The punitive nature of the sanction here is evident under the tests traditionally applied to determine whether an Act of Congress is penal or regulatory in character. . . . Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding ofscienter, whether its operation will promote the traditional aims of punishment — retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions." (Id. at pp. 168-169, fns. omitted.)
[7] Also applying the Mendoza-Martinez factors, the Alaska Supreme Court later held the same sex offender registration laws violated the state constitution's ex post facto clause. (Doe v. State (Alaska 2008)189 P.3d 999, 1018-1019 (Doe).)
[8] When defendant was sentenced, former section 290, subdivision (a)(1)(A), was still in effect. Mandatory registration is now provided for by section 290, subdivisions (b) and (c).
[9] When defendant was sentenced, former section 290, subdivision (a)(2)(E), was still in effect. Discretionary registration is now provided for by section 290.006.
[10] In October 2007, the Legislature "reorganize[d] and renumber[ed]" the sex offender registration laws. (Legis. Counsel's Dig., Sen. Bill No. 172 (2007-2008 Reg. Sess.).) Former section 290 was repealed and its provisions reenacted as sections 290 through 290.023. (Legis. Counsel's Dig., Sen. Bill No. 172 (2007-2008 Reg. Sess.).)
[11] The analysis may be different when the residency restriction is imposed through mandatory sex offender registration. In those cases, the statutory maximum penalty for the triggering offense includes the residency restriction, which is itself mandated by statute. We need not reach this issue because the court imposed the residency restriction upon defendant through discretionary sex offender registration.
[12] Because the intent issue is so close, we wonder whether the residency restriction's nonpunitive intent may be outweighed only by "`"the clearest proof'" of a punitive effect. (Smith, supra,538 U.S. at p. 92; see id. at p. 110 (conc. opn. of Souter, J.) [questioning standard of review when indications of punitive and nonpunitive intent are in "equipoise"]; id. at p. 115 (dis. opn. of Ginsburg, J.) [rejecting standard altogether].) Nonetheless, our analysis adheres to the "clearest proof standard.
[13] The "language of an opinion must be construed with reference to the facts presented by the case; the positive authority of a decision is coextensive only with such facts." (PLCM Group, Inc. v. Drexler (2000)22 Cal.4th 1084, 1097 [95 Cal.Rptr.2d 198, 997 P.2d 511] [limiting factually inapt California Supreme Court precedent].) And "`"[i]t is axiomatic that cases are not authority for propositions not considered."'" (Silverbrand v. County of Los Angeles (2009) 46 Cal.4th 106,127 [92 Cal.Rptr.3d 595, 205 P.3d 1047] [distinguishing Cal. Supreme Court precedent].)
[14] Importantly, the E.J. court "emphasized" that the petitioners were parolees challenging "the enforcement of [the residency restriction] as a statutory parole condition," noting "the limited nature of the rights retained by registered sex offenders while serving out a term of parole."(E.J., supra. 47 Cal.4th at pp. 1282-1283, fn. 10.) It stressed that "parolees have fewer constitutional rights than do ordinary persons" — "`[a]lthough a parolee is no longer confined in prison[,] his custody status is one which requires and permits supervision and surveillance under restrictions which may not be imposed on members of the public generally.'" (Ibid.) Accordingly, "[t]he Legislature has given [the California Department of Corrections and Rehabilitations] expansive authority . . . to impose any parole conditions deemed proper." Parole conditions may be onerous, as long as they are reasonable and not "`arbitrary and oppressive.'" (Ibid.) So parole conditions "`may govern aparolee's residence, his associates or living companions, his travel . . . and other aspects of his life.'" (Ibid.) And by underscoring a parolee's limited rights "while serving out a term of parole," the E.J.
court implied the residency restriction would not survive the petitioners' discharges from parole — consistent with the general rule that parole expires by operation of law upon completion of the parole term. (See §§ 3000, subd. (b)(5), 3001, subd. (a); see also In re Torres
(2010) 186 Cal.App.4th 909, 917 (111 Cal.Rptr.3d 919].)
[15] He filed his motion pursuant to Hofsheier, supra,37 Cal.4th at page 1207, where the court "concluded imposition of mandatory lifetime sex offender registration on defendants convicted of violations of . . . section 288a, subdivision (b)(1) for voluntary oral copulation with a 16- or 17-year-old minor violated the state and federal equal protection clauses." (Picklesimer, supra, 48 Cal.4th at p. 335, fn. omitted.)
[16] No Apprendi issue would arise in Picklesimer's case in any event, even if the residency restriction is punishment. Picklesimer waived his right to a jury trial by pleading guilty to three sexual offenses: unlawful sexual intercourse with a minor (§ 261.5), oral copulation with a minor (§ 288a, subd. (b)(1)), and sexual penetration of a minor (§ 289, subd. (h)). (Picklesimer, supra, 48 Cal.4th at p. 336.) Picklesimer's admissions to these offenses' elements would themselves support a trial court's finding he acted due to sexual compulsion or for sexual gratification, warranting imposition of discretionary sex offender registration. A court may increase the penalty for an offense beyond the statutory maximum based upon the defendant's admissions. (Apprendi,supra, 530 U.S. at p. 488; see Blakely, supra, 542 U.S. at p. 303 ["the `statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdictor admitted by the defendant").) *Page 1120